THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

GLADYS N. HAMBRICK,

*Defendant and Appellant.*

(No. 2367; August 3, 1948; 196 Pac. (2d) 661)

2

4

For the Defendant and Appellant, the cause was submitted upon the brief and also oral argument of Carlton A. Lathrop of Cheyenne, Wyoming and W. A. Bryans of Denver, Colorado.

For the Plaintiff and Respondent, the cause was submitted upon the brief of Norman B. Gray, Attorney General, Cheyenne, Wyoming, S. K. Briggs of Rawlins, Wyoming and W. A. Muir of Rock Springs, Wyoming, and oral argument by Mr. Briggs and Mr. Muir.

## OPINION

Blume, Justice.

Three different informations for embezzlement were filed against the defendant, Gladys N. Hambrick. The first information contained ten counts, the second two counts, the third thirty-nine counts—fifty-one counts in all. By agreement of the parties, the cases were consolidated for trial, which lasted 23 days. The court instructed the jury to find the defendant not guilty on five counts, which was accordingly done. Forty-six counts were left for consideration of the jury, who found the defendant guilty on all these counts. Sentence of imprisonment was imposed on the defendant pursuant to conviction, and from that sentence, she has appealed to this court. The embezzlement alleged was of the funds of the Memorial Hospital of Carbon County, and that institution will generally hereafter be referred to as the hospital.

I.  Change of Venue.

Defendant filed a motion to change the venue of the action to another county, on account of the prejudice

of the people of Carbon County against the defendant. The change of venue was not granted, and error is assigned herein on that account. The prosecuting attorney opposed the motion, taking issue with the allegation as to prejudice of the people of the county aforesaid. The motion was heard on March 8, 1946. Eight affidavits were filed to the effect that a number of people had discussed the case, expressing that the defendant was guilty; that the people of Carbon County were prejudiced against her, and that she could not receive a fair trial in that county.

The defense called, aside from the defendant herself, but one witness, a former member of the hospital board who resided in a place of about 40 people, and who seems to have based his testimony to the effect that the defendant could not have a fair trial in Carbon County mainly on his conversation with one person. The witness himself was not prejudiced, and stated that he would give the defendant a fair trial. The state examined seven witnesses from different parts of the county. All of them testified that they did not know of any reason why the defendant could not receive a fair and impartial trial in the county. Some of them had not even heard the case discussed, and knew of no local excitement, and of no prejudice against the defendant. The witness Kelser stated that a lot of people had discussed the case when it first came up, but that it had become a closed subject, those expressing an opinion as to the guilt or innocence of the defendant being about evenly divided. The witness Cunningham stated that there had been some little comment on the case when it first came up, but that he had heard nothing since that time. The witness Farmer had heard just a few people discuss the case, with opinions about evenly divided. The witness Chaplin, living at Rawlins, stated that he knew of no local prejudice against the defendant, that he had heard the case discussed, and

that he thought more people believed the defendant guilty than the other way.

Two articles published about the case in the Rawlins Daily Times, with a total circulation of 3,188 were introduced in evidence. The first of these was published when the first information had been filed; the second, when a further information was filed. These publications purported merely to state the facts.

The court overruled the motion. The case was set for trial to begin on June 6, 1946. In the meantime, on June 4, 1946, an editorial appeared in the Rawlins Daily Times to the following effect:

## "TRY MRS. HAMBRICK HERE

The trial of Mrs. Gladys Hambrick, former superintendent of Rawlins Memorial Hospital, scheduled for Wednesday in district court here, is one that should be held in Carbon County—there should be no change of venue whatsoever. And 'extraneous chips,' if there be any, should fall where they may.

FIRST—The alleged offense occurred in Carbon County.

SECOND—According to information released by county officials at the time the developments ensued there was a shortage in excess of $37,000 during the period June, 1940, and September 19, 1945, when Mrs. Hambrick was superintendent. That is a lot of money —the taxpayers' money, including that which is paid by the businessmen of this county.

THIRD—There are reports current others are involved in this deplorable situation. Whether this is true is up to County Attorney S. K. Briggs to ascertain, both before and during the trial, and to act accordingly and to the law he has sworn to uphold.

FOURTH—There should be no attempt or thought by Attorney Briggs to transfer this trial out of Carbon County—it is a Carbon county affair affecting Carbon county monies.

FIFTH—The pre-trial claim in some quarters that it will be impossible to obtain a jury to try Mrs. Ham-

brick is sheer nonsense. There are more than enough 'good and true' men and women in Carbon county to constitute a jury to sit in this trial of alleged thievery from a public institution. The fact that Mrs. Hambrick's bond, on which she is free pending trial, is $14,-000 speaks for the seriousness of this situation.

According to the auditor's report, money has been stolen from Memorial hospital, an institution supported by Carbon County taxpayers.

Those guilty should be brought to trial in Carbon county.

There is a little verse which sums up the entire situation:

'In vain we call old notions fudge,
And pare our conscience to our dealings;
The Ten Commandments will not budge,
And stealing will continue stealing.'"

When court convened at Rawlins on June 6, 1946, the trial judge immediately took the matter of the editorial in hand and permitted the motion for a change of venue to be reopened. The panel of the jury consisted of 32 men, and he examined each of them separately in chambers to determine what, if any, effect the editorial above-mentioned had upon the members of the panel. Three of them had read the editorial and had formed some sort of opinion as to the guilt or innocence of the defendant. These three were excused as jurors. Four others "thought" that they had read the editorial, but stated that it had no effect on them. One stated that he had read "something" of the editorial, without any effect. One stated that he didn't pay much attention to it. One read the editorial but thought the defendant not guilty. Four others also read the editorial, but stated that it had no effect on them. The remainder of the panel, constituting the majority, had not read the editorial at all. The motion for a change of venue was again denied.

After three jurors had been excused, 29 men were

left. None of them were challenged for cause, but one was excused because he was friendly to the defendant and thought that that would influence his decision. Another was excused apparently mainly because he would not "hang" the jury if 11 were against him. Of the 12 regular jurors serving in the case and the extra juror, nine of them had not read the editorial above-mentioned. Of the remainder, one merely read "something" of the editorial. Another paid no attention to it. Another "thought" that he had read it. All of them stated that the editorial had no effect on them whatever, that they had no prejudice against the defendant, and had not formed or expressed an opinion as to the guilt or innocence of the defendant. Nearly the same situation was disclosed as to the jurors who were challenged for cause. The state exercised four of its peremptory challenges, the defendant eight—all that were allowed by statute. In all, five of the panel of 32 jurors were excused by the court on its own motion, one of them apparently because he was too friendly to the defendant. A situation similar to that presented in the case at bar appears in the case of State v. Bess, 60 Mont. 558, 199 Pac. 426, where the court stated:

"The publication of an account of a killing, and even intimating that the defendant is the guilty party, is of itself not to be regarded as a sufficient ground for the transfer of the case to another county for trial. Newspapers do, no doubt, affect public opinion in matters upon which they take a decided stand; but before their effect can be pronounced so baneful and highly prejudicial as to warrant a change of venue, it must be shown that they were passionate enough to excite undue prejudice, to the extent of rendering it impossible for an accused to secure a jury free from exception. The ruling of the court was against the defendant upon this issue. The voir dire examination of the jury disclosed that, of the 40 talesmen called, 10 were peremptorily challeneged by the defendant, 4 by the state, and only 14 were excused because they had formed an opinion upon the merits of the case. This fact

alone goes a long way in overcoming the charge that the court abused its discretion by refusing to change the place of trial. Upon the whole, we find no reasonable ground upon which to differ with the district court upon this issue."

A killing is apt to arouse excitement and prejudice. A case of embezzlement is not nearly as apt to do so, if at all. Section 3-1906 Wyo. Comp. St. 1945 provides in regard to a change of venue in a criminal case that "if it appears to the court or judge, upon such hearing, that the trial would be more impartial in another county, the application shall be granted." And counsel for the defendant called our attention to Section 3-1902 Wyo. Comp. St. 1945, which provides that if a corporation having 50 stockholders is a party to an action in a civil case, on affidavit of the opposite party that he cannot have a fair and impartial trial in the county, sustained by affidavits of five persons, the venue shall be changed to another county. This, say counsel for the defendant, fixes the policy of our statute even in a criminal case such as that before us, for the reason that the hospital involved in this case is supported by public funds raised by taxation, and each taxpayer in the county is in a situation similar to that of a stockholder of a private corporation. We are cited to the case of Baxter v. State, 91 Ohio St. 167, 110 N. E. 456. In that case, the defendant was tried for embezzlement of funds in a bank which had 257 stockholders and 5,000 depositors. The court held that a change of venue should have been granted, basing its reasoning, in the main, upon a statute reading the same as Section 3-1902 supra. We do not thnik that the case should be held to be controlling herein. We hesitate to hold that a change of venue should, upon application, be granted in every case in which embezzlement is charged of the public funds of a county, city, town, hospital, or library, or other public organization supported by taxation. That we think would be going too far. If carried to

extreme, it would mean that a defendant charged with embezzling money of the state could not receive a fair and impartial trial anywhere. In the Ohio case, the question of change of venue was but one of the questions involved. Serious error was held to be committed in other matters, and we are not at all certain that the Ohio court would have reversed the case merely because no change of venue was granted. While there is an analogy between the stockholders of a corporation and the taxpayers of a county, it is generally the case, as we all know, that taxpayers seldom get excited in connection with the disbursement or other disposition of public funds, and that, of course, would be more true in a case such as this where the hospital is supported by public funds only partially. In the later Ohio case of Hawkins v. State, 27 Ohio App. 297, 161 N. E. 284 —not an embezzlement case—the court, in part, stated as follows:

"A person who commits crimes cannot expect good people to speak kindly of him or praise his wrongful and unlawful acts; * * * it does not necessarily follow that one so criticized and denounced, even if by a large number of the citizens of the county, may not, if placed on trial for a crime, have a fair and impartial trial in the county where such criticism and denouncement occur. In the instant case a jury was in fact duly impaneled and sworn. The fact that five veniremen had opinions as to the guilt or innocence of the plaintiff in error is of no moment. Seldom is a jury impaneled in any criminal case without first excusing one or more veniremen for fixed opinions as to the merits of the case."

In 22 C. J. S. 310, speaking of local prejudice, it is stated: "The question to be determined is whether or not there is reasonable ground for fear that the alleged prejudice actually exists, and that accused will not receive a fair trial. It is not sufficient merely to show that great prejudice exists against accused; it must appear that the prejudice is so great or so general as

to prevent him from receiving a fair or impartial trial." Whether or not a change of venue should be granted is ordinarily within the sound discretion of the trial court. 22 C. J. S. 323. It is only when that discretion has been abused that an appellate court can intervene, and whether such abuse exists is often, if not generally, a most difficult point to determine. The first hearing on the motion for a change of venue occupies more than 50 pages of the record; the second hearing and the voir dire examination, some 258. We have read the whole thereof, and have compared what appears therein with what appears in the cases cited by counsel for the defendant and not heretofore mentioned, and which they claim present facts similar to the facts in the case at bar. We do not find that to be true. The situation presented in these cases appears to us to be entirely different from the situation presented in the record before us. So far as we can tell, the trial judge did all that he was able to do, and all that could be reasonably expected, to insure for the defendant a fair and impartial trial. He not only made a special examination of the jurors as above-mentioned, but also kept the jurors together during the whole of the 23 days of trial, although that was not necessary in a case like that at bar under our statutes.

Considering the record as a whole, we cannot say that the trial court abused its discretion in the matter here under discussion, and the assignment of error in this connection must be overruled.

II.   Removal of Prosecuting Attorney.

The defendant filed a motion in the case to remove S. K. Briggs, County and Prosecuting Attorney for Carbon County, as prosecutor from the case. The court overruled the motion, and that is assigned as error. The point is argued in the brief for the defendant in this court at great length. It is objected that Mr.

Briggs took a special interest in the case, even going to the expense of interviewing one Jane Elwell, a former nurse at the hospital, at her then residence at Lincoln, Nebraska. Prosecuting attorneys in this state do not ordinarily have the money to employ detectives, and the greater burden of investigating a case ordinarily falls on them. We see no objection to the action of the prosecuting attorney in this case. Another alleged ground for removal of Mr. Briggs from the case is the fact that he brought a civil action on behalf of the Memorial Hospital at Rawlins to recover the sum of $10,000 from the defendant as money belonging to the hospital, and caused an attachment to be issued against the property of the defendant. It is stated in 18 C. J. 1312, as follows: "If the prosecuting attorney has a personal interest in obtaining an acquittal or conviction, it may disqualify him. * * * He should not act in a case if he has before appeared in a civil suit against the same party, based substantially upon the same facts, * * * On the other hand, the mere prejudice of the prosecuting attorney against defendant although open to criticism by the court, will not disqualify him," etc. In Callahan v. Jones, 200 Wash. 241, 93 Pac. 2d 326, the court stated:

"The principle was long ago laid down that no man can serve two masters. It is not consistent with the public interest that a prosecuting officer may receive personal gain as the result either of the conviction or acquittal of one charged with infraction of the law, or in connection with the filing of any charge. Neither should the power of the state be used to discover facts or evidence which might result in private profit to the official vested by law with authority to use such power. The very appearance of evil in connection with the administration of public office must be avoided."

The principle is, of course, sound, but has no application in the case at bar. It is not claimed herein that Mr. Briggs received any compensation for bringing the

civil action above-mentioned, nor does it appear that he brought an action on behalf of a private individual. The Memorial Hospital of Carbon County, it is true, is a body corporate. Section 26-703 Wyo. Comp. St. 1945. The institution is created by the board of county commissioners. Bonds may be issued and taxes levied to support that institution. Section 26-701 Wyo. Comp. St. 1945. The trustees of the hospital are appointed by the board of county commissioners, and they must make an annual report to them. Section 26-706 Wyo. Comp. St. 1945. Hence the hospital is, in fact, a county institution. Section 27-604 Wyo. Comp. St. 1945 provides as follows:

"Each county and prosecuting attorney shall receive such fees or salary, or both, as may be allowed him by law, and the county and prosecuting attorney shall not receive any fee from or prosecute or defend for any individual or corporation in any civil or criminal suit, or proceeding at law, in which this state or his county may be a party, but in all such cases he shall prosecute or defend for the state or county, and if such attorney shall fail, neglect or refuse to perform any and all official duties enjoined upon him by law, he and his sureties shall be liable, in each case, on his official bond in a sum not less than one hundred dollars ($100.00) and not more than five hundred dollars ($500.00), in the discretion of the court having jurisdiction of such cases."

While, in the civil case above-mentioned, the hospital was necessarily made the party plaintiff, Carbon county was a real party in interest, and there is some question in our mind as to whether or not, under the foregoing statute, it was not the duty of Mr. Briggs to bring the civil action when the county commissioners of Carbon county demanded of him to institute the action, as appears to be the case. It is not necessary to definitely decide the question. Mr. Briggs withdrew from the civil action, and Mr. Harold Johnson, an attorney at law at Rawlins, Wyoming, took his place in

that action. We think it clear that the assignment of error here considered is without merit.

### III.   Opening Statement of Prosecuting Attorney.

Counsel for defendant complained that the opening statement of the prosecuting attorney to the jury was not a "brief" statement of the evidence by which the state expected to prove the allegations of the information. The statement is set out in the record and is about twenty-six pages in length. Several pages are taken up with preliminary matters which were necessary to be shown in the case. The defendant was charged with embezzlement of various items set out in fifty-one counts, so that the opening statement was, on the average, about one-half page in length as to each count. We have read the statement, and are under the distinct impression that the statement was, in fact, "brief."

The prosecuting attorney stated at one place that "to set up every count of embezzlement that is involved in this action, would be too large a case, we could never get through with it, so we have only set forth a small number of the actual embezzlements in the situation. To do otherwise, would necessitate a jury trial of six months or longer." Counsel for defendant call this a reckless statement, tending to create great prejudice in the minds of the jury. The actual amount involved in the fifty-one counts of the informations was about $2,800. The evidence in the case tends to show that the defendant embezzled nearly $40,000, so that we can hardly say that the statement was an exaggeration as to what would be proven. Hence, we cannot say that it was a statement such as to require a reversal of the judgment. Counsel for the defendant say that the opening statement will reveal a "laborious monologue." A monologue is scarcely designed to inflame the passions of the jury or create any prejudice in their minds. The statements in the cases cited by counsel on this

point are altogether different from the statements made in this case.

Counsel for the defendant interrupted the opening statement at various times, and one of the objections was sustained. At one point of the statement, the prosecuting attorney mentioned the fact that a certain check had been deposited, and counsel for the defendant then inquired as to where the deposit was shown. The assistant prosecutor objected to the interruption as tending to create a confusion. The court then remarked that "counsel for the defendant will be admonished not to interrupt the opening statement any further." Counsel bitterly assail this statement of the court. They say that "the harm that would follow in the wake of this proceeding is beyond imagination. * * * A jury might possibly conclude that what the prosecuting attorney was then saying to them met with the approval of the court." We think that counsel exaggerate the importance of the matter. The statement of the court was perhaps too broad, since interruption at times is doubtless warranted and sometimes required, but we do not think that any prejudice was created in the minds of the jury by reason of the ruling of the court, or that any harm to defendant resulted.
IV. Endorsement of Witnesses on Informations.

The state had endorsed on the information the Union Pacific Railroad Company and R. Wipprecht, Auditor of the company, also the Workmen's Compensation Department of the State of Wyoming and Earl Wright, State Treasurer, also the name of John J. McIntyre, State Auditor. The specific officials named did not appear, but sent other officials in their stead to testify in the case; namely, John F. Sweeney, Deputy Auditor of the Railroad Company; William Petry, in charge of the Workmen's Compensation Department; and Josephine Dendinger, Deputy Auditor, and the prosecution, on

June 7, 1946, the day after the trial commenced, asked to endorse the names of these substitutes on the informations, and the court permitted that it be done. It is, of course, clear that the defendant was in no way prejudiced by these substitutions.

On June 18, 1946, the prosecuting attorney filed a motion, supported by affidavit, to endorse the names of B. Farmer, Thelma Hoyme and Amy N. Sundquist, as witnesses on the informations, stated that these witnesses would testify that they gave receipts for money due to the hospital and turned such money over to the office of the hospital. The motion further stated "That the reason why said witnesses' names were not endorsed upon the Criminal Informations is as follows: The State of Wyoming, the prosecution, had no idea that the defense would raise the inference that the above named persons who receipted for certain monies received by the hospital never deposited the same in the cash drawer; that counsel for the defense were shown all of the unnumbered receipts the prosecution held in their possession, among which were receipts signed by T. Hoyme, B. Farmer and Amy N. Sundquist, and were thereby apprised of the names of said witnesses now wished to be endorsed on said Informations;"

These witnesses were employees at the hospital. In the main, they merely testified that they had signed receipts previously introduced in evidence, and previously referred to by other witnesses. The receipts signed by them were not numbered. They were taken from an unnumbered receipt book, and, as will more fully be shown when we come to discuss the guilt or innocence of the defendant, that fact itself would seem to indicate, without referring to the testimony of these witnesses, that the money evidenced by those receipts, in all probability came into the hands of the defendant. In other words, their testimony, in the

main, merely strengthened other evidence to that effect. The indication in the record is that counsel for the defendant had knowledge of the fact that these witnesses signed the receipts above-mentioned, and had knowledge of the nature of the testimony which these witnesses would probably give if called to the witness stand. Hence counsel cannot be said to have been surprised by the offer of the testimony of these witnesses. The surprise, if any, could have been merely that counsel for the state woke up to the fact that the state's case might possibly be strengthened by having these witnesses testify.

Section 10-602 Wyo. Comp. St. 1945 provides, among other things, with reference to the prosecuting attorney, as follows: "He shall also endorse thereon the names of such witnesses as may thereafter become known to him at such times before the trial as the court may rule or otherwise prescribe." Section 10-603 Wyo. Comp. St. 1945 provides as follows: "The failure to endorse the name of the prosecuting witness, or the names of other witnesses, shall not be ground for the quashing or setting aside of the information and unless the defendant or his counsel, shall move or request that such endorsement shall be made, if not already made, the defendant shall be deemed to have waived his right to have such endorsement made, and *such endorsement may be made before, at or after any trial.*" (Italics supplied). These statutes were considered by this court at considerable length in Boulter v. State, 6 Wyo. 66, 42 Pac. 606, and State v. Bemis, 34 Wyo. 218, 242 Pac. 802, and we need not do so again in this case. In general, these cases endorse the rule stated in 23 C. J. S. 252-254 to the effect that the trial court may, in its discretion, allow the endorsement of the names of witnesses on the informations even during the trial of a case. The court, in State v. Bemis (34 Wyo. 238) expressly stated that the provisions of Section 10-603

Wyo. Comp. St. 1945, to the effect that "such endorsement may be made before, at or after the trial," is not controlled by the provisions of Section 10-602 Wyo. Comp. St. 1945, but should be construed as conferring express authority for endorsement at or after the commencement of any trial, at least by permission of the court. Counsel for the defendant seem to think that when a defendant has duly made a motion for the endorsement of witnesses on an information as mentioned in Section 10-603 Wyo. Comp. St. 1945, and an endorsement has been made accordingly, that thereafter, no further endorsement may be made. That point, too, was considered in State v. Bemis supra (34 Wyo. 238) and the court disagreed with the contention of counsel now made. In view of these authorities and the facts, we cannot hold that the court abused it discretion in permitting these witnesses to testify. It is true that Thelma Hoyme testified to some collateral matters, that is to say, matters not directly connected with the fifty-one counts of the informations. However, her testimony was but cumulative of similar testimony given by other witnesses, and we do not think that the case should be reversed because of the admission of that testimony.

V.   Guilt or Innocence of Defendant.

Counsel for defendant argue that the evidence in this case is insufficient for conviction. We think that counsel are in error. They admit that the defendant personally received the amounts charged to have been embezzled in four or five of the counts of the informations, and it is shown that these amounts were not paid over to the hospital. Counsel accordingly are virtually compelled to admit that the defendant appropriated to her own use the sums involved in these counts of the informations. Defendant was sentenced to prison for a term of four to eight years on each of the forty-six

counts on which she was found guilty, the sentences to run concurrently. It has been held that, if in such cases, the conviction on any count is valid, it is unnecessary to consider the convictions on any other count. United States v. Sheridan, 329 U. S. 379; 67 Sup. Ct. 332; 91 L. Ed. 359; Hirabayashi v. United States, 320 U. S. 81, 85; 63 Sup. Ct. 1375; 87 L. Ed. 1774; Pinkerton v. United States, 328 U. S. 640; 66 Sup. Ct. 1180; 90 L. Ed. 1489; 24 C. J. S. 673. However, we have laboriously and painstakingly examined the evidence as to each of the counts on which the defendant was convicted, and we have not found that the evidence in any of the cases is insufficient for conviction. We have thought it fairer to the defendant, although the opinion will be long, to discuss the evidence in the case to some extent, although, of course, all we can do is to give a summary of the vital testimony contained in some 3,000 pages of the record and the 500 or more exhibits introduced in evidence. C. W. Reed, an auditor of the firm of Ernst and Ernst, and with a number of years of experience in auditing books, examined and audited the books of the hospital. He started the examination on September 19, 1945, and testified that the first defalcation by defendant took place on December 4, 1940, and the last on September 17, 1945.

Defendant had the general superintendency of the affairs of the hospital, which naturally included the duty to receive its money and to deposit it in the depositary of the hospital. That depositary, in the case, was the First National Bank of Rawlins. A cash book was kept which showed the daily receipts. The entries therein, so far as relevant in the case, were ordinarily made by the defendant, particularly commencing about the early part of 1941 excepting, of course, during the times when the defendant was absent from Rawlins, which generally was for comparatively short periods, although at one time in 1944 she was absent

for a period of about eight weeks. The deposit slips relevant herein, too, were generally made out by the defendant unless otherwise stated herein. The cash book listed the deposits which were made and the amounts deposited were mentioned as "banked", followed by the date and the amount. It was the custom at the hospital to issue what is called an admittance card for each patient which contained the name of the patient, the date of admittance to the hospital, and the date of discharge. In addition to that, there was used what is called a ledger card that contained the name of the patient, the date of admittance to the hospital, and the date of discharge therefrom. They were numbered consecutively. They also contained separate columns for debit and credit entries. The column for credits was divided into three parts, one showing the date of payment, another the receipt number issued, and another the amount paid.

At the time when the defendant became the superintendent of the hospital, only one set of receipts for money received was issued. That set was numbered consecutively. The defendant, however, changed this and adopted two sets, one numbered and one unnumbered. Payments were made at times to nurses or other employees when neither an office girl nor the defendant was in the office. That was generally at night, and, in these cases, an unnumbered receipt was given, leaving a carbon copy in the book. It was perhaps convenient, in these cases, that an unnumbered receipt book be used. But judging from the testimony of the witnesses Hagins, Ford, Sjogren, McCarthy, and Beeler, commencing with about February 1942, after Jeane Spencer, office clerk up to that time, had left, receipts from the unnumbered receipt books appear to have been issued to patients, who paid money, in all or nearly all cases—that is to say even by the office clerk and the defendant herself. The evidence indicates that

from that time on, the numbered receipt book was kept in the separate office of the defendant. The unnumbered receipt book was kept in the office of the office clerk, which also was the general office of the hospital. It was intended to enter all the amounts shown in the unnumbered receipt book into the numbered receipt book. Since a receipt from the unnumbered receipt book had already been given to the patients, or at least to most of them, the original of the receipts from the numbered receipt book, in all but a few instances, was thrown into the waste basket, leaving only the carbon copy. The system was adopted, as the defendant claimed, so that the records would be neater. Of course, even with the waste involved as above-mentioned, there would have been nothing particularly wrong with the system adopted if all the amounts shown by the carbon copies in the unnumbered receipt books had actually been shown by the numbered receipt book, but that, in many instances, is not true. The evidence indicates that the defendant destroyed, or caused to be destroyed, all of the unnumbered receipt books and the carbon copies contained therein except the last book used, covering October, November and part of December, 1945. At least none other were found when the audit above-mentioned was made. That, of course, opened up an unlimited field for the perpetration of fraud by the defendant as well as danger to her. Since most of the receipts in the unnumbered receipt books were issued by others than the defendant, the slightest precaution would have suggested the danger of destroying these books, and the suspicion is not unwarranted that this was done for the express purpose of covering up unlawful appropriation of money to her own use. About 38% of the numbered receipts were issued by persons other than the defendant, but after Jeane Spencer had left, that percentage was generally much smaller. The witness Reed testified that no short-

ages were found in cases in which the numbered receipts were issued by others.

In the first count of the first information, the defendant was charged with embezzlement of $54.49. That amount was, on January 16, 1941, paid to the hospital by check by one Eugene Williams. The entry in the cash book covering that date is by Jeane Spencer, but does not contain the Williams check which evidently was turned over to the defendant herself. The amount collected, as shown by the cash book was $637.42. The duplicate of the deposit slip contains that amount and is in the handwriting of Jeane Spencer. It shows currency in the amount of $79.24 and a total as above-mentioned. The original of the deposit slip is also in evidence. On the bottom, in the handwriting of the defendant is inserted the Williams check for $54.49, but the currency shown thereon is only the sum of $24.75 instead of $79.24, the exact difference of $54.49 represented by the Williams check. It seems reasonably clear that this change was made by the defendant and that she appropriated currency in the sum of $54.49 to her own use.

The defendant, in the second count of the first information, is charged with embezzling the sum of $180.00 on February 11, 1943. It appears that the hospital received from the Carbon County Welfare Board the sum of $489.12. The defendant, in her handwriting, entered on the numbered receipt 6616 the sum of $309.12 instead of the sum received. A like entry was made by the defendant personally in the cash book as of date February 11, 1943, and the deposit in the bank was made by her accordingly. Thus, there was a shortage of $180.00. It is hardly probable that these entries were made by mistake. A deliberate falsification of the amount received seems to be indicated. While the check of $489.12 was deposited, the shortage

must have occurred by her appropriating to her own use currency in that amount.

A similar shortage of $100 and in like manner is shown in connection with the third count of the first information. The defendant received from the State Auditor of the state, on or about November 19, 1943, in connection with Workmen's Compensation, a warrant for $406.30. Defendant, in her handwriting, entered numbered receipt 7919 for the sum of $306.30, or $100 less than received. She made a like entry, in her handwriting, in the cash book as of date November 24, 1943, and the deposit in the bank was in accordance with such entries. It is hardly likely that these entries were made by mistake.

In the sixth count of the first information, the defendant is charged with embezzling $200 in May, 1944. The hospital received from the Union Pacific Railroad Company the sum of $608.80, but the defendant, by receipt numbered 8577 written by herself, shows the amount received as $408.80, or $200 short. The cash book also written by her shows only $408.80, and the deposit in the bank was made by her in accordance with the lower figure. It is hardly possible that these entries were made by mistake, and the shortage was brought about in a manner similar to that mentioned above.

In count nine of the first information, the defendant is charged with embezzling the sum of $106.20 on July 18, 1945. She, on behalf of the hospital, received this sum from Arnold Good. An unnumbered receipt and an itemized and receipted bill for this amount is in her handwriting. Neither the numbered receipt book nor the cash book shows an entry in that amount, and the bank deposit made does not include it. It seems clear that the defendant appropriated this amount to her own use.

In the twenty-eight count of the third information,

the defendant was charged with embezzling $92.10. W. C. Johnson paid that amount to the hospital on July 5, 1944 on behalf of his daughter, Patricia. The itemized statement and receipt for this amount was signed by the defendant personally. The ledger card of Patricia Johnson is in the record. It shows that the foregoing amount was paid by Receipt No. 8733, but that is not true. That numbered receipt was, in fact, issued to someone else. No entry of the amount received is found in the numbered receipt book or in the cash book, and no deposit for the amount was made. It would seem to be clear that the defendant appropriated the foregoing amount to her own use.

In count thirty of the third information, the defendant is charged with embezzling the sum of $70.24 on December 1, 1944. That amount was paid to the defendant personally by Charles Ballard on behalf of Elsie Ballard, but the amount received was not entered on the cash book nor in the numbered receipt book, nor was a deposit of this amount made in the bank. The appropriation of this amount, too, by the defendant to her own use seems to be clear.

In count thirty-three of the third information, the defendant was charged with embezzling $74.70 on July 12, 1945. The record shows an itemized statement and receipt for this amount in the defendant's handwriting. The patient was Madeline Teers. No entry for this amount is found in the cash book nor in the numbered receipt book, nor was the amount deposited in the bank for the hospital. It seems clear that this amount, too, was appropriated by the defendant to her own use.

In connection with count thirty-seven of the third information, it appears that the hospital received the sum of $183.45 from Jens Hansen, a patient. The amount was seemingly paid by check, and this check

was deposited by the defendant and shown on the deposit slip on October 11, 1943 in the handwriting of the defendant, so that there can be no doubt that the amount was paid and that the check came into the possession of the defendant, but the amount is not noted on the cash book. The amount shown on that book, all in the handwriting of the defendant, as received up to and including the foregoing date, is $319.50. The deposit slip is made in accordance with that amount. Had the $183.45 been shown on the cash book, it would have been larger of course by the amount of $183.45. A shortage accordingly is shown and it seems to be clear that the defendant appropriated that sum to her own use in currency instead of appropriating the check itself. The ledger card of the patient shows that the foregoing account was paid by receipt numbered 7745, but that is not true, since that numbered receipt was, in fact, issued to Tom Kennedy for the sum of $5.00, and the receipt is in the handwriting of the defendant. A situation similar to the foregoing is shown in connection with count four of the first information where it appears that the defendant appropriated to her own use the sum of $130.21 paid by C. C. Cox.

It would subserve no good purpose to single out the evidence bearing upon other specific counts of the information. The remainder of our discussion will be general. In connection with a number of the counts in which a shortage was found, the money was, in the first instance, collected by a nurse or other employee in the hospital. One of these was Jane Elwell, office clerk, now living in Lincoln, Nebraska, who, as appears from the record, was friendly to the defendant, and who, we should judge from the record, refused to appear as a witness in the case. Others were Grace Sjogren, Anette Hagins, Laura Lee Beeler, Nancy Ford—office clerks—and Thelma Hoyme, Amy Sundquist, Beatrice Farmer—nurses. These parties testified that they turned mon-

ey collected by them and shown by unnumbered receipts over to the defendant or put it in a drawer in the office of the hospital. Counsel for the defendant seem to think that there is doubt as to the guilt of the defendant in these cases because, as they claim, it was not shown that defendant actually received the money. But the record indicates two ways by which the money so received is traced into the hands of the defendant. One of these is in connection with the so-called ledger cards. And we speak particularly of the time after Jeane Spencer, office clerk, left in February, 1942. It has heretofore been stated that the ledger cards of the patients contained a column showing the payments made by them. The amounts collected by the foregoing employees in connection with the counts in the information now considered are in fact found on the ledger cards of the patients, entered thereon, ordinarily at least, by one of the office clerks. If, accordingly, it appears that these ledger cards came to the attention of defendant, we come close to showing that she knew of the money collected by the parties above-mentioned. The defendant, as superintendent of the hospital, was primarily responsible for the collection of the money due the hospital. Presumably she knew when the patients in the hospital were leaving, and that ordinarily payments by them were made at that time. Presumably also she would at that time or soon thereafter examine the ledger cards of these patients and discover what had been paid. In fact, the evidence of the office clerks above-mentioned indicates that after the date and amount of payments were entered by them on the ledger cards, these cards together with the unnumbered recepits would be laid on the defendant's desk for her to enter on the former the number of the numbered receipts, and that she, with few exceptions, entered whatever number was actually inserted. One division of the column showing payments was intended

for the entry of a numbered receipt evidencing such payments. Not to have entered such a number might have created instant suspicion. Hence, one was inserted. Since the numbered receipt book was kept in defendant's private office, it would have been hazardous for anyone else, in an attempt to embezzle money of the hospital, to enter such numbers. It is not likely that they would have known the numbers current in that book. They would have been in the greatest danger of almost immediate detection, and defendant would have entered complaints of shortages. There is no evidence of such complaints. The witnesses Grace Sjogren, Nancy Ford, Thelma Hoyme, Beatrice Farmer, and Laura Lee Beeler testified that she made none; and that testimony, we think, was properly admitted. Hence, it is highly probable that the numbers were entered, or were directed to be entered, by defendant personally, and that, accordingly, she knew of the amounts collected, and that they came into her possession.. But in connection with the counts now considered, the receipt number of the ledger cards does not correspond with the numbered receipt as actually issued. In other words, the numbers entered on the ledger cards in these cases are false or, as expressed by the witness Reed: "One numbered receipt would be used to support the payment made by two or more people." For instance, as already mentioned in the case of Jens Hansen, Receipt No. 7745 was actually for the amount of $5.00 issued to Tom Kennedy. The same number was inserted in the ledger card of Jens Hansen. No numbered receipt for the payment of $183.45 by Hansen was actually issued. Hence that number entered on his ledger card was false and was evidently inserted merely so that detection of the fraud would be possible only after examination of the receipt of that number as actually issued. It is the theory of the state that all of these false numbers were entered by the defendant and,

in most instances, so far as the counts now considered are concerned, that was shown by direct evidence to be true. And the theory of the state seems to be correct, not alone in view of the evidence related, but also by reason of the fact that the numbered receipts, as actually issued at or about the time when these false numbers were inserted, were in the defendant's handwriting, showing her control at that time of the books containing the numbered receipts. Invariably in the cases in which a false number was entered in connection, at least, with the counts of the information, no correctly corresponding numbered receipt was issued at all. No entry of the corresponding amount appears in the cash book and no deposit of the amount involved was made. The combined facts here described point, we think, to the credibility of the witnesses who testified as above-mentioned, and to the correctness of the conclusion at which the jury arrived in these cases.

Morever, the unnumbered receipt book and the carbon copies of the unnumbered receipts therein contained came into the defendant's possession, and she destroyed them, or caused that to be done. She was supposed, under the system adopted by her, to copy these receipts into the numbered receipt book and show the amounts received at one of the numbers in that book, but many times she failed to do so. It is unbelievable that she did not examine the carbon copies of the unnumbered receipts and did not know the amounts shown thereby, knowing as she must have known that the failure to copy the amounts as above-mentioned and the failure to turn these amounts over to the hospital constituted embezzlement or the connivance at embezzlement by others. The failure here mentioned could be due only to the grossest ignorance or to the intention to defraud. Judging generally from what we glean from the record, the defendant is not ignorant. On the contrary, she strikes us as a woman above aver-

age intelligence. In other words, the only reasonable conclusion would seem to be that she know of each and every item received by others on behalf of the hospital and entered on the unnumbered receipt book; that she received these items into her possession, and that she appropriated every said item not shown by the numbered receipts, and hence not by the cash book and deposit. The only escape from that conclusion would seem to be that her employees did not in some or all of the instances use a receipt from the unnumbered receipt book. That is contrary to the evidence, and the possibility of that is minimized, if not entirely dissipated, by the entry by defendant, as already stated, of a number, and that a false one, on the ledger cards of the patients.

In connection with some of the counts, there was no direct testimony that money had been turned over to the defendant. The amounts were shown on ledger cards. In these instances, too, the number of the receipt entered on the cards was false. There was no entry of the amounts received on the cash book and no deposit was made in the depositary bank. What we have heretofore said in connection with the false numbers of receipts applies in these instances. The false receipt numbers above-mentioned, which appear in connection with the counts of the information, constitute, as indicated by the record, but a small part of the total of false receipt numbers issued. The witness Reed, accountant, testified that by this method of falsifying numbers, the shortage of the defendant, as discovered by him, amounts to a total of $23,276.17. In some instances, no ledger card of the patients was found, but the amounts paid by them was discovered in various ways. In these instances, too, at least so far as relating to counts in the information, there is no properly corresponding numbered receipt, no entry in the cash book, and no deposit of the amount involved. The wit-

ness Reed testified that he found approximately 675 ledger cards missing; that pursuant to the audit and investigation which he made, the shortage in the accounts of the defendant in that connection amounted to the sum of $10,706.50; that by another method, namely by crediting the hospital with smaller amounts than actually received, he found a shortage in the accounts of the defendant in the sum of $2,908.56; that a further shortage of $373.01 appears by another method. The total shortage in the accounts of the defendant, as found by him, was the sum of $38,762.93.

In the midst of the audit that was made, currency in the sum of $2,200 was sent to the hospital. The first was sent on October 12, 1945 in the sum of $500. The others were in the sum of $900, $600, $200, and $100. The sum of $40 was sent to Ernst and Ernst in Denver. All were apparently sent from Rawlins—four of them in envelopes of the hospital. The first two envelopes were addressed to the defendant as superintendent of the hospital, and were sent by special delivery letter. There is testimony that the address was written on the Royal typewriter in defendant's office. Counsel for defendant claim that their client never wrote on a typewriter. The third sum was sent by special delivery in an envelope of the hospital addressed to the defendant as superintendent, but the address was pasted on the envelope and written on a different typewriter. One of the lesser sums was contained in an envelope of the hospital and was shoved under the door of the office of the hospital. It seems to be the theory of the state that this money was sent to the hospital by the defendant herself, conscious of her guilt, and that she had an opportunity of procuring the currency since she was on a vacation soon after the audit was commenced. The defendant in conversation with the witness Reed disclaimed ownership of the money, saying that she had never taken any of the money of the hospital and that

she was being "framed." It is doubtless the theory of the defendant that the money was sent by someone else who had embezzled some of the money of the hospital, or that it was sent to cast suspicion on the defendant. The matter was one for the jury to judge.

The defendant became superintendent of the hospital about August 15, 1940. Her salary at first was $150 per month, but was gradually increased, and on July 22, 1945 was the sum of $225 per month in addition to her board and room, etc. The total salary paid her during the time that she was superintendent was the sum of $11,271.10. The state introduced evidence of her deposits during this time in the First National Bank of Rawlins, both in her checking account and her savings account, and also in the Federal Savings and Loan Association at Rawlins. Her checking account commenced in February, 1941, her savings account in the First National Bank on October, 1941, and her deposits in the Federal Savings and Loan Association in 1943. We have combined the various deposits shown by the testimony, and while we have not taken the time to check and recheck the items, the amounts here given are approximately correct. Her total deposits in the foregoing institutions while she was superintendent of the hospital amounted to $29,383.75. The difference between these deposits and her salary was the sum of $18,112.65. An attempt was made on behalf of the defendant to show that this difference in the amounts did not come about by the defendant appropriating funds from the hospital. It appears that she received about $600 to $800 from allotment checks from the United States Government. The witness Albert Sjogren testified that he bought a radio, silverware and towels from the defendant in the amount of about $285. The witness Ruth Hoyes, a former nurse at the hospital for a period of a little more than two years, testified that the defendant, when at Denver, bought for her goods

in the sum of $200 to $250 per annum, and that she, the witness, repaid the defendant. Her credibility was a question for the jury. The testimony indicates that the defendant bought goods for others, including some of the nurses, but so far as we can tell, this did not involve any great sums of money, so that the record before us does not show that the difference above-mentioned was reduced by anything more than a comparatively small amount. The fact that this remaining difference does not correspond to the amounts of shortages testified to by the witness Reed is not, of course, important, since the defendant may have deposited other amounts in other banks and in other states. Her checking account in the First National Bank at Rawlins was for a time in the joint name with her husband, but the testimony shows that the defendant made all the deposits so that we see no importance in that point. Of course, the extra deposits might have come from sources perfectly legitimate. That matter was within the peculiar and personal knowledge of the defendant, nor should it have been necessary, as counsel for the defendant argue, that defendant take the witness stand in order to explain the situation. The extra money was derived from some source; from persons, partnerships or corporations. At least some of the parties could have been produced to testify that at least some of the money came from legitimate sources, if that was the fact, but no such testimony was produced, permitting the inference that the difference above shown, or the major part thereof, was part of the money of the hospital which defendant appropriated to her own use.

Defendant introduced evidence showing her reputation for honesty to be good. We do not think it would subserve any good purpose to set out other testimony produced on her behalf aside from what we have mentioned. None of it was such as to modify or to overcome the case made by the testimony of the state. Tak-

ing all of the foregoing facts into consideration, we are unable to see how any jury which would perform its duty could have properly arrived at a result different from that arrived at by the jury in the case at bar. Counsel for the defendant, it would seem, need not blame themselves for not making better or greater efforts to save the defendant from conviction. They did the best they could. The facts appear to be simply such that no counsel, however able or ingenious, could have done better than they did.

VI.   Collateral Testimony and Instruction Thereon.

As already noted, quite a little of the testimony related to accounts of embezzlement other than those charged in the fifty-one specific counts of the informations. That was particularly true in the case of the witness C. W. Reed. Error is charged that this testimony should not have been damitted, but the courts generally do not agree with counsel in a case such as the one before us. Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627; Lewis v. State, 30 Ariz. 466, 248 Pac. 39; 22 C. J. S. 1123-29. A full discussion of the rule may be found in Shipp v. Commonwealth, 19 Ky. L. 634, 41 S. W. 856.

The prosecuting attorney, in his opening statement, stated that evidence of embezzlement other than those directly charged in the various counts of the informations would be introduced for the purpose of showing motive, intent, and a systematically planned and deliberate embezzlement. Counsel for the defendant contend that the court should in addition have given an instruction that such collateral evidence was admitted only for such limited purpose. No such instruction was requested. The subject is discussed in 23 C. J. S. 415 and 16 C. J. 856, from which it appears that an instruction limiting the purpose for which evidence of other crimes is admitted is often necessary. A number

of the cases involved homicide. In Jaynes v. People, 44 Colo. 535, 99 Pac. 325, mentioned at length in the later case of Reppin v. People, 95 Colo. 192, 34 Pac. 2d 71, it was said that when such evidence of other crimes is sought to be introduced, the prosecuting attorney should state the purpose for which it is sought to be introduced, and that the court, when requested, should follow up by a proper instruction limiting such testimony to a definite purpose. In the case at bar, the prosecuting attorney, as already mentioned, stated the limited purpose for which the evidence as to collateral matters, that is to say, collateral crimes, would be introduced, and no request for an instruction by the trial court was requested. In Baxter v. State, 91 Ohio St. 167, 110 N. E. 456, an embezzlement case, the court held that even though the prosecuting attorney stated the limited purpose for which evidence of other crimes was introduced, nevertheless, the failure of the trial court to give an instruction on the subject was error. In that case, however, it appears that other embezzlements sought to be shown were not connected with the embezzlement charged in the information, the contrary of which is true in the case at bar, and the testimony as to such other embezzlements was not convincing. In 23 C. J. S. 415, it is said that no instruction of the court limiting the purpose of certain testimony is necessary "where the evidence admitted to show motive or intent is of acts which may well be supposed to have been done in furtherance of such motive or intent." A good illustration of that is found in the case of Shipp v. Commonwealth, supra. That case involved false entries in the books of a bank by a cashier—a case similar accordingly to the case at bar. The court held that an instruction of the trial court limiting the purpose for which testimony of similar entries were made was unnecessary, the court stating: "In the case at bar, while it may have been proper to inform the jury,

when the testimony was admitted, of the purpose of its admission, the evidence admitted was of acts which may well be supposed to have been done in furtherance of a general design of fraud upon the bank, and therefore formed a part of the res gestae." ' And, in 23 C. J. S. 950-951, it is stated to be a general rule that failure to give an instruction limiting the purpose for which particular evidence may be considered is not error in the absence of a request therefor. We think, accordingly, that the contention of counsel for the defendant above-mentioned cannot be sustained.

VII.   Necessity for Demand.

Counsel for the defendant seem to argue that it was necessary to make a demand on the defendant for the payment of the money which was found to be due from her. The court instructed the jury that defendant was prosecuted under Section 9-322 Wyo. Comp. St. 1945, which does not make a demand necessary. That section is as follows:

"Every officer, agent, attorney, clerk, servant or employee of any person who, having access to, control or possession of any money, article or thing of value, to the possession of which his employer is entitled, shall, while in such employment, take, purloin, secrete or in any way whatever appropriate to his own use, or to the use of others, any money, coin, bills, notes, credits, choses in action, or other property or articles of value, belonging to or deposited with, or held by such person, in whose employment said officer, agent, attorney, clerk, servant or employee may be, shall be deemed guilty of embezzlement and shall be imprisoned in the penitentiary for not more than fourteen (14) years." That statute was considered in the case of Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627, where it was held that it was not necessary to allege a demand in the information for an embezzlement under this statute. That would seem to indicate that no demand would be necessary to be proven. In 18 Am. Jur. 583, it is stated:

"As a general rule, if a criminal intent accompanies a misappropriation of funds or property held by an agent or fiduciary, the crime of embezzlement is complete and the owner of embezzled property need not make a demand for its return, in the absence of a statute to the contrary. It is only when other evidence to prove a fraudulent conversion is not available that the proof of a demand is necessary."

See also 29 C. J. S. 684, and 20 C. J. 429. There was sufficient evidence in this case to show the criminal intent above-mentioned and the objection above-mentioned must be overruled.

VIII.   Defendant's Deposits in Bank.

One of the witnesses for the state was Robert Bible, Cashier and Vice President of the First National Bank of Rawlins. He testified that the defendant had a checking account and a savings account in the bank; that, during the time that defendant was superintendent of the hospital, she deposited in these accounts the net sum of $27,846.64; that, of this amount, from $600 to $800 consisted of allotment checks from the United States Government, and the sum of $11,271.10 was salary which the defendant received during this time, leaving unexplained the source of nearly $16,000 of these deposits. The defendant objected to this testimony on the ground, first, that the state had not proved the corpus delicti in the case; that it was incompetent, irrelevant and immaterial, for the reason, second, that it was an indirect attempt to compel the defendant to testify against herself, and third, because it was a confidential and privileged matter between a banker and depositor, which could not be disclosed by the former over the objection of the defendant. The further objection is raised in this court that the witness was incompetent, but so far as we can find that point was not raised in the court below, so we need not consider it.   Counsel have cited no cases sustaining the last of

the objections made in the trial court, and we know of none; nor do we think that it was an attempt to compel the defendant to testify against herself. It is surely not the rule that testimony prejudicial to the defendant must be excluded merely by reason of the fact that the defendant is the only one who can explain it. No authority to that effect has been cited. As a matter of fact, as already stated, there is no reason to say that the defendant was the only person who could explain these deposits if they, in fact, legally belonged to her. If she received money from legitimate sources, nothing appears in the record why she could not have had at least some of the parties from whom she received it to testify in the case. On the first of the foregoing objection, the court ruled that if the corpus delicti should not be proven, the testimony would be stricken. The order of producing testimony is largely in the discretion of the trial court. State v. Bemis, 34 Wyo. 218, 242 Pac. 802. Hence, we see no error in the foregoing rulings of the court.

IX.   Oath of Bailiffs.

As already stated, the jury were kept together during the whole time of the trial and were not permitted to separate, although it was in the discretion of the court to permit them to separate when the court was not in session. Section 10-1315, Wyo. Comp. St. 1945. They were placed in charge of two bailiffs, who took their oath as such immediately after the jury were sworn. It is claimed that they should have again taken an oath when the jury was sent out to find a verdict. It is, however, stated in 23 C. J. S. 1014, that: "Where the same officer has charge of the jury from the inception of the trial and has been properly sworn, it is not necessary that he be specially sworn each time that he retires with the jury."

It is also claimed that the oath taken by the bailiffs

did not conform with the provisions of our statutes. The oath administered to them was as follows:

"You do solemnly swear that you will faithfully and honestly perform the duties of Bailiffs at the present term of this Court; that you will obey all instructions of the Court and that when a jury is placed in your custody during the trial of any case, you will not allow such jury to separate nor allow anyone to converse with them, nor allow them to converse with anyone, except upon order of this Court; and that you will return them into Court as the Court may order. So help you God."

Our Statute Section 15-122, Wyo. Comp. St. 1945 prescribes the oath to be taken by a bailiff placed in charge of a jury in a criminal case in justice's court, but no specific oath is prescribed in the trial of a criminal case in the district court. Section 10-1315 Wyo. Comp. St. 1945 provides that: "The proceedings provided by law in civil cases as to the conduct of the jury, the admonitions of the court, and the manner of returning the verdict, shall be had upon all trials on indictments, so far as the proceedings may be applicable, and when it is not otherwise provided." Section 3-2410 Wyo. Comp. St. 1945, relating to civil cases, provides:

"When the case is submitted, the jury may decide in court or retire for deliberation; if the jurors retire, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict, or are discharged by the court, subject to the discretion of the court to permit them to separate temporarily at night, and at their meals; the officer having them under his charge shall not suffer any communication to be made to them, nor make any himself, except to ask them if they have agreed upon their verdict, unless by order of the court; and he shall not, before their verdict is rendered, communicate to any person the state of their deliberations, or the verdict agreed upon."

Assuming that the oath taken by the bailiffs should be in substantial compliance with the provisions of this

section, we find that they must not suffer any communication to be made to them, while the oath taken was that they should not allow anyone to converse with the jury. In 1 Chitty's Criminal Law 632, we find the oath prescribed to the effect that a bailiff should not permit anyone to "speak" to the jury. Section 3-2410 supra also provides that the officer should not make any communication with the jury himself, with the exception mentioned in the statute. The oath actually taken was that he should not permit the jury to converse with anyone (which would include the officer himself), except upon order of the court. While improvements might be made in the oath actually taken, we do not think that the deficiency therein, if any, was such as to warrant this court to reverse the judgment herein on that ground. Furthermore, the court, in Instruction No. 29, told the jury as follows:

"You are instructed that while you are in charge of a sworn bailiff or bailiffs, you will not discuss, or in any manner deliberate the case, except while in the room provided by the Court for your convenience, and then only while under locked doors and while no other person is present or within hearing.

"Should it become necessary during your deliberations for the bailiff or bailiffs to conduct you to meals, or to retire with you for the night to the dormitory, or other sleeping quarters;

"You are instructed that upon retiring to such dormitory or sleeping quarters, the bailiff of the Court is instructed to sleep in the same room with you, and while you are in his charge, going to, during, and returning from meals, or while he is in the same room with you, you will not discuss, or in any manner deliberate, or talk about the case."

There is no indication in the record that the provisions of Section 3-2410 supra were violated, or that the bailiffs or the jury were guilty of any misconduct. The objections of counsel herein discussed were not made until the jury returned their verdict. We think, accord-

ingly, that the assignment of error in this connection should be overruled. See 23 C. J. S. 1013.

X.   Reference to Defendant Not Testifying.

The defendant did not take the witness stand. It is contended that reference thereto was made by Mr. Johnson, of counsel for the state, in violation of Article 1, Section 11 of the Constitution of the State, which provides that "no person shall be compelled to testify against himself in any criminal case;" also, in violation of the Fifth Amendment of the Constitution of the United States, providing, "nor shall any person * * * be compelled to be a witness against himself, nor be deprived of life, liberty or property without due process of law;" and also in violation of Section 10-1201 Wyo. Comp. St. 1945, reading as follows:

"The defendant in all criminal cases, in all the courts in this state, may be sworn and examined as a witness, if he so elect, but shall not be required to testify in any case; and the neglect or refusal to testify shall not create any presumption against him, nor shall any reference be made to, nor shall any comment be made upon, such neglect or refusal to testify."

The point here involved has puzzled as well as troubled us no little in view of the meager record before us. As nearly as we can tell from the record, the court was in recess, and the trial judge was in chambers at 10:30 A. M. on June 25, 1946, the last day of the trial. A recess was then taken to 1:45 P. M. of the same day, for the purpose of preparing the court's instructions. Exception was taken to some of them. The reporter's notes do not mention the giving of instructions to the jury or the arguments of counsel in open court. The only reference to the point here in question is as follows:

"WHEREUPON, at the close of argument for the State, by Mr. Harold Johnson, the following proceed-

ings were had in Chambers, out of the presence of the jury, to-wit:

"BY MR. BRYANS: The Defendant now objects to the latter portion of counsel's closing argument, wherein he said the Defendant had not explained her bank accounts, and moves that the jury be now instructed to disregard it, and the same be stricken from the record.

"BY THE COURT: The motion will be granted and the jury instructed to disregard it.

"BY MR. BRYANS: The defendant now moves for a mistrial of this case for the reason that the remarks of counsel in his closing argument at this time may have had a tendency to prejudice the jury against the defendant, and the same is prejudicial to the rights of the defendant and in violation of the Statutes of the State of Wyoming, in such case made and provided. The Defendant further moves a mistrial of this case because, notwithstanding the fact that the Court has granted a motion to strike the same from the record, the said remarks of counsel were made to this jury, and it is impossible for this Court to determine whether such remarks may or may not be eradicated from the minds and memory of the individual jurors.

"BY THE COURT: The motion is denied."

In the state's brief in this court, it is stated that the argument of Mr. Johnson followed the argument of Mr. Bryans, chief counsel for the defendant, and that Mr. Johnson's argument was followed by the argument of Mr. Muir, of counsel for the state, and it is further stated: "At the time counsel for the defendant made his objection, neither the trial judge nor counsel recalled the exact language used by Mr. Johnson in his closing argument. * * * Mr. Johnson stated then, and he still contends, that he made no such request or comment to the jury. It will be noted that the language in quotation marks, 'The defendant has not explained her bank accounts,' could not possibly be correct. What Mr. Johnson contended he said, and what he still contends he said, is 'that the defendant's attorneys have failed

to explain the defendant's bank accounts.'" Similar statements were made in the oral argument in this court, and we do not recall that they were contradicted by counsel for the defendant. It is unfortunate that the record fails to show the facts as now contended by counsel for the state. In the shape in which we find the record, it lacks the certainty which would make a solution of the point before us satisfactory.

The record fails to show that Mr. Johnson stated that, "The defendant has not explained her bank accounts." We have the mere assertion of counsel for the defendant to that effect. Matters assigned as error should appear affirmatively on the record, not by the mere statement of counsel as to what was done. (See Boulter v. State, 6 Wyo. 66, 80, 42 Pac. 606). Nor is it plain whether or not counsel meant to state the exact language alleged to have been used or merely the general effect of it. If he had meant to give the exact language, then it would seem counsel should have said "defendant *has* not explained her bank accounts" instead of saying that "defendant *had* not explained her bank accounts." How important it is that the record should show the exact language before us may be gleaned, for instance, from the able discussion in State v. Monahan, 96 Conn. 289, 114 Atl. 102, and see Miller v. Commonwealth, 153 Va. 890, 149 S. E. 459, 68 A. L. R. 1102; Mundy v. Commonwealth, 161 Va. 1049, 171 S. E. 691-696. It is true that the trial judge apparently acquiesced in the assertion of counsel for the defendant, and if we should reverse the case on the point under discussion, it would have to be solely because of that implied acquiescence of the trial judge, since there is nothing else in the record to support the assertion of Mr. Bryans. It is almost needless to say that we should be reluctant to base a reversal on such a foundation, without having before us an unequivocal statement of the trial judge that Mr. Johnson stated the exact

words: "The defendant has not explained her bank accounts," as Mr. Bryans possibly meant to assert. The trial judge, in chambers, probably in doubt as to the exact language used by Mr. Johnson, sustained the motion for direction to the jury to disregard the statement of Mr. Johnson, so as to give the defendant the benefit of his doubt. The exact statement: "The defendant has not explained her bank accounts" would, we fear, perhaps have been fatal. But the trial judge promptly overruled the motion for a mistrial. So it is quite apparent that he did not consider the statement actually made by Mr. Johnson as fatal. He must have interpreted the assertion of Mr. Bryans as meaning that the effect of the language used by Mr. Johnson was that the defendant had not explained her bank account. And we think that he was justified in that interpretaton, for we assume that Mr. Bryans makes no claim to infallibility; nor can we attribute such infallibility to the trial judge. In making the ruling last mentioned, the trial judge must have been at least doubtful as to the exact language used by Mr. Johnson, or, as indicated above, he may have been even certain that the language used was in no way fatal. In view of the uncertainty as to what may have been in the trial judge's mind when he apparently acquiesced in the assertion of Mr. Bryans, it would seem that we should hesitate to give that apparent acquiescence the force which counsel for the defendant now claim for it.

The difficulty confronting us cannot all, if any part, be laid at the door of the trial judge. It could have been easily avoided by counsel for the defendant. All they needed to do was to request that the arguments for the state be reported. They made no such request, and no report thereof was made. Again, they could have promptly objected in open court at the time when the offending statement was made, so that there might be no doubt as to what was actually stated, and not leave

the matter in uncertainty and conjecture. But they waited until the court stood in recess and the trial judge was in chambers, as stated in the record before us, before they made any objection. It is a rule that generally objections should be made promptly. State v. Wilson, 32 Wyo. 37, 228 Pac. 803; Webb v. People, 97 Colo. 262, 49 Pac. 2d 381; 23 C. J. S. 595. And, it is further held that accused should make his objection publicly, in open court. Gillespie v. State, 85 Tex. Crim. Rep., 210 S. W. 967; 23 C. J. S. 597. In Horn v. State 12 Wyo. 80, 163, 73 Pac. 705, Justice Potter, after quoting at length from an Iowa case dealing with misconduct of counsel for the State, and holding that objection should be made promptly, had this to say: "As an additional reason for the rule we have been led to approve, it may be said that the trial judge will ordinarily be more capable of fairly determining whether the language is legitimate or prejudicial if his attention be called to it at the time." In Commonwealth v. Weber, 167 Pa. 153, 31 Atl. 481, the court, speaking of misconduct by the prosecuting attorney, stated:

"No judge can be expected to anticipate the line of argument counsel will adopt, and caution him against improper speech; a judge may and often does, of his own motion, stop counsel in improper statements, and administer rebuke. But he may not give close attention to all that counsel say when addressing the jury; nor is he required to; that is the duty of opposing counsel, and if the argument be objectionable, the objection should at once be made to the court; then the words can be taken down by the official reporter, and be made the subject of ruling by the court, and review here."

Had that course been pursued in the case at bar, a different situation would be before us, and then we could be more certain as to what was actually said and what the trial judge understood as having been said. It is not at all unlikely that, when an interval of time intervened between the argument made by Mr. Johnson and

the time when the trial judge was in his chambers, the facts mentioned in the brief for the state actually took place. But, if we must disregard the denials and explanations of counsel for the state, as made in this court, on which counsel for the defendant will perhaps insist, and if we must be technical and rely solely on the record here, then we must ignore not only a part, but everything that counsel for the state have said on the subject, including their presence in chambers, and the situation then before us, so far as the record shows, is this: The court was in recess, for the record states that the proceedings here in question took place in chambers. The trial judge was there, as well as Mr. Bryans, for both of them spoke. It does not appear that anyone else was there. The record does not show that counsel for the state were present so as to have an opportunity to deny or explain the assertion of Mr. Bryons. We know of no rule of law that would justify or authorize us in indulging in a presumption that certain counsel were present at the judge's chambers at a particular time or on a particular occasion. Not being shown to be present so as to have the opportunity above-mentioned, neither the assertion of Mr. Bryans nor the implied acquiescence of the trial judge above-mentioned can be held binding on the state. The fault herein, of course, lies in the defect of the record before us. It was the duty of the appellant to present to this court a record which would enable the court to pass on the error complained of, without resorting to conjectures.

In a number of states, it is held that "Misconduct of a prosecuting attorney in commenting on the failure of the defendant to testify does not result in a miscarriage of justice warranting a reversal, when the evidence of the defendant's guilt is clearly established." 84 A. L. R. 791. We have already heretofore indicated our view as to the guilt of the defendant. We need not,

and do not, go so far as to hold this rule to be applicable when it is clear and positive as to what was actually stated, but we think that the rule should be applied in a case where it is open to question as to what was actually said, as is true in the case at bar. We think, accordingly, that the assignment of error in the foregoing connection must be overruled.

A few other points are argued. We have considered them with care. We do not find any prejudicial error in connection therewith. Among these points is the fact that a spectator made a remark to the witness Reed. A lengthy argument is made in connection with this matter. While it was of course irregular, it was, so far as the record shows, perfectly harmless.

Finding no reversible error, the judgment is *affirmed*.

RINER, C. J., and KIMBALL, J., concur.

## ON PETITION FOR REHEARING
## AND ON MOTION FOR DIMINUTION OF THE
## RECORD

(November 9th, 1948; 198 Pac. (2d) 969)

Norman B. Gray, Attorney General, Cheyenne, Wyoming, W. A. Muir of Rock Springs, Wyoming, and S. K. Briggs of Rawlins, Wyoming, for plaintiff and respondent.

## OPINION ON REHEARING

BLUME, Justice.

A petition for a rehearing has been filed herein by counsel for the defendant. They again discuss in the brief the removal of the prosecuting attorney from the case, his opening statement, the questions with reference to collateral testimony, and the objections raised against certain witnesses. We considered these points and discussed them rather fully in our original opinion in this case. Further discussion would seem pointless, and we have been unable to change our opinion thereon.

It is urged that when considering whether or not the trial judge abused his discretion in not granting a change of venue, we did not consider the fact that Section 3-1906, W. C. S. 1945, partially cited in the original opinion, provides that: "If it appears to the court or judge, upon such hearing, that the trial would be *more* impartial in another county, the application shall be granted." (Italics supplied). Counsel argue that the statute makes degrees of an impartial trial just as courts speak of degrees of negligence. The statute relating to this subject is, in so far as relevant herein, as follows:

"The defendant in a criminal action may make an affidavit stating that he believes he cannot receive a fair trial owing to the bias or prejudice of the judge or the excitement or prejudice against him in the county; * * * if the affidavit sets forth that there is excitement or prejudice in the county against the defendant, the prosecuting attorney may thereupon traverse by his affidavit the allegations of defendant, and the court or judge shall thereon set down the issue so presented for trial before him at a stated time, at which time both

parties shall appear and support their respective affidavits by witnesses examined orally or by affidavits, and if it appears to the court or judge, upon such hearing, that the trial would be more impartial in another county, the application shall be granted."

We have found no statute of another state exactly like ours, and none has been called to our attention. It may be noted that according to the first part of the section quoted, the issue to be determined is as to whether or not the defendant can have a "fair" trial in the county in which he is charged. The term "fair" doubtless was intended as the equivalent of "impartial", and we do not think that the statute meant the point to be broadened when, in the latter part of the section, it mentions a "more impartial" trial. There are natural degrees of negligence. There are no natural degrees of impartiality. The term "more impartial" is merely a tautological expression for "impartial." Even if there were a difference, the question of abuse of discretion in connection with "more impartiality" would be just as difficult to determine as an abuse of discretion in connection with "impartiality," unless counsel mean to assert that if it appears that there is any prejudice on the part of any persons against a defendant in the county in which he is charged, then a change of venue should be granted as a matter of course. We cannot read the statute as it stands in that manner and we clearly did not consider it in that way in State vs. Vines, 49 Wyo. 212, 54 Pac. 2d 826, although that exact point was not discussed therein.

In the original opinion, we discussed the question as to whether or not Mr. Johnson, of counsel for the state, stated to the jury: "Defendant has not explained her bank accounts." We held that the record was so indefinite on that point that we could not reverse the case on account of any objections made in connection therewith. Counsel for the defendant have now filed in

this court a motion for diminution and correction of
the record. The motion is supported by affidavits.
Briefly, it is stated in these affidavits that Mr. Briggs,
of counsel for the state, opened the case; that he was
followed by Harold Johnson, also of counsel for the
state, and that at the close of the argument of Mr.
Johnson, and immediately upon him making reference
to defendant, counsel for the defendant arose, and in
open court made the objections and motions mentioned
in the original opinion. And they insist in their argu-
ment at this time that Mr. Johnson stated: "Defendant
has not explained her bank accounts." If the motion be
construed as one to have the record corrected in the
trial court, then we are met with the case of State, etc.
vs. Allen, 42 Wyo. 51, 288 Pac. 1058, and cases therein
cited, in which it is held that an application for with-
drawal of the record on appeal for correction from
memory of witnesses is too late after the close of the
term at which the judgment has been rendered, and
that it can then be amended only upon minutes or
memoranda in possession of the court or judge. It does
not appear by the motion or the affidavits attached
thereto that any such minutes or memoranda are in
the possession of the court or judge. We, however,
construe the motion to mean that the record should be
corrected in this court. On that point, it is stated in
4 C. J. S. 1393, that aside from some clerical errors,
an appellate court cannot amend the bill of exceptions.
That, of course, also applies to a Record on Appeal. It
is said in the foregoing authority:

"Since the appellate court acts only upon the record of
the court below as made up by the court in which the
trial proceedings took place, in the absence of statute
the appellate court has no power to amend the bill of
exceptions, even by consent of parties, and defects
therein are amendable only in the trial court."

Again, in the case of Hatfield vs. Jakway, 102 Neb.

831, 170 N. W. 181, the court held that the record in a case should not be amended after the case had been argued and submitted and decided by the appellate court. The court stated, among other things:

"Before the days of official court reporters, the only method of obtaining a review was for each party to preserve the evidence and his exceptoins, and, after submission to the adverse party, have the court settle them, and make the bill a part of the record. This responsibility still rests on the appealing party. When he presents his bill to the adverse party and the court, he vouches for its correctness, and when the court makes it a part of the record it imports verity, and can only be corrected by being withdrawn and corrected in the court from which it comes. Such a motion comes too late after the case has been decided. Otherwise, a reviewing court might spend time and labor upon a record, such as in this case, and, after it was decided, be compelled to review the whole case again."

Again, counsel for the state have filed a resistance to the motion made herein. That is supported by the affidavits of Mr. Briggs, the prosecuting attorney, by W. A. Muir, one of the counsel for the state, and by Harold M. Johnson, also one of the counsel for the state. We are not certain even now just what Mr. Johnson stated in his argument to the jury. He tells us in his affidavit that he was fully aware of the law that no reference to the defendant not taking the witness stand should be made, and that when Mr. Bryans made the objection under discussion, "there was a strong disagreement between the affiant and Mr. Bryans as to the exact words used in the affiant's argument." Mr. Muir swears, among other things, that the motion made by Mr. Bryans, objecting to the statement made by Mr. Johnson, was made in chambers, just as stated in the record before us. Among other things, he states:

"That the said Harold Johnson, during his argument to the Court and Jury, at no time mentioned the defendant's name, and at no time stated: 'That the De-

fendant *has not* explained her bank accounts.' That the said Harold Johnson, during his argument, did not state, 'that the Defendant *had not* explained her bank accounts,' nor did he in any manner, as affiant recalls, refer to defendant personally, or attempt to call to the Jury's attention, either by direct statement or by innuendo, the fact, that defendant had not been sworn and taken the witness stand, or testified in her own behalf."

The affidavit of Mr. Briggs is substantially to the same effect. In view of the foregoing, we think that the motion for the correction of the record must be denied, and we must adhere to the conclusion arrived at in the original opinion. After all, counsel, in their eloquent appeal to this court, overlook the basic fact that it is our function to determine whether or not the record affirmatively discloses prejudicial error to the defendant. If it does not, it is our solemn duty to affirm the judgment. Painstakingly as we have examined the record, we have come to the conclusion, though not, perhaps, without some misgivings, that it does not disclose such error. The trial judge is presumed to know the law. It is not, we think, unreasonable for us to conclude, as already substantially stated in the original opinion, that if Mr. Johnson had in fact made a really prejudicial statement, he would have granted the motion for a mistrial. Not having done so, we are not justified in indulging in the presumption that the statement made by Mr. Johnson was fatally prejudicial, nor justify a contrary conclusion because of the assertion made by Mr. Bryans.

In addition to the petition for rehearing filed by counsel for the defendant herein, we have before us a document signed by the defendant personally, and which we may consider as a petition for rehearing filed by herself. We need not comment on this unusual aspect or say anything as to the propriety thereof or as to what we should do in another case where a similar

situation might appear. The sum and substance of the defendant's personal document is that in another trial, she could go on the witness stand and refute and explain the charges made against her, and she makes a number of assertions in contradiction of what appears in the record before us. She apparently, doubtless in common with many laymen generally, believes that when a case comes to this court on appeal, it is open for all purposes. But that is not true. We hear no new evidence. We consider the case merely upon the record as it is brought to us from the trial court, and we consider merely questions of law, not of fact. We can do no better than quote from what we said in the recent case of State vs. Koch, decided in January, 1948, and appearing in 64 Wyo. 175 189 Pac. 2d 162, 169:

"The trial judge and the jury were in much better position to judge of the weight of the evidence, and it is not ordinarily the province of this court to substitute our judgment for that of the jury when, as in this case, there is sufficient evidence, if believed, to convict the defendant. * * * The responsibility for the conviction herein rested upon the jury where it properly belongs. * * * The trial judge approved the verdict and he saw the witnesses on the witness stand. It would seem that he felt that the defendant is guilty, and we are not in a position to be able to say that he was wrong."

Defendant, a woman, proud, highly intelligent, always accustomed to her freedom as she chose to make it, is now confronted with the agonizing probability of confinement for several years—enough to daunt the stoutest heart. So her personal petition herein is like a cry out of her mental wilderness in which she now finds herself. We can understand that cry. We can appreciate it. Judges are not callous; their chord of sympathy, too, is attuned to human suffering, to human pain, to human agony, as is that of others. But our power is limited. It is prescribed by the constitution and the laws of this state. We cannot defy or ignore

these provisions. If relief is to be had, it must be sought at the hands of authorities vested with power different from that vested in this court. The petitions for rehearing herein must accordingly be denied.

RINER, C. J., and KIMBALL, J., concur.