Abdullah Kru AMIN, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Donald Brian CALKINS,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Nos. 90–109, 90–110.

Supreme Court of Wyoming.

May 7, 1991.

J. John Sampson, Sheridan, for appellants.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Karen A. Byrne, and Hugh Kenny, Sr. Asst. Attys. Gen., Cheyenne, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Appellants, Abdullah Kru Amin and Donald Brian Calkins, appeal from their jury convictions for kidnapping and aggravated assault and battery in which their sentencing was enhanced by the effect of Wyoming's habitual criminal statute.

We affirm.

## ISSUES

Appellants raise these issues:

1. The trial court erred and abused its discretion when it failed to grant defendants' motion for change of venue.

2. The trial court erred in excluding the testimony of Raymond Leidig, M.D. and refusing appellants' jury instructions.

3. Appellants should be granted a new trial on the basis that they received ineffective assistance of counsel.

    A. Should counsel have called the witnesses requested by appellants, and should counsel have issued a subpoena earlier?

    B. Should defendant, Donald Calkins, be evaluated?

    C. Should counsel have permitted defendants to be present for motion hearings?

The State of Wyoming poses its statement of the issues as follows:

I. Did the trial court abuse its discretion in denying the motion to change venue?

II. Should the trial court have instructed the jury on the defense of "necessity"?

III. Were the appellants denied effective assistance of counsel?

## FACTS

Shortly after 7:00 a.m. on December 2, 1988, at the Wyoming State Penitentiary in Rawlins, Amin, an inmate, entered the office of counselor Barbara France, grabbed her around the neck and held a half pair of scissors to her throat. At that same time, Calkins, also an inmate, entered the office of counselor Betty Lewis and confined her there, holding a homemade razor-knife (a plastic pen with utility razor blades inserted on two sides and reinforced with masking tape) to her neck. Lewis screamed for help, thus alerting a guard to the situation. The guard activated an alarm and set in motion standard prison procedures. The guard approached both Amin and Calkins, but both threatened to kill the counselors if anyone interfered with them. Amin and Calkins demanded to talk to the press and, in addition, Amin demanded to talk to his mother. Prison administrators negotiated with Amin and Calkins for the release of the counselors and, approximately eleven hours later, France and Lewis were released physically unharmed to prison au-

thorities. Amin and Calkins were charged with, and convicted by a jury of, kidnapping[1] and aggravated assault.[2] For purposes of enhanced penalty, both were charged under Wyoming's habitual criminal statute.[3] Both were found to be habitual criminals pursuant to W.S. 6–10–201(b)(ii) (June 1988 Repl). Amin was sentenced to two concurrent life sentences, the sentences to be served consecutively to the sentences he is already serving. Calkins was sentenced to two concurrent terms of forty to fifty years, the sentences to be served consecutively to the sentences he is currently serving.

## DISCUSSION

### Change of Venue

Amin and Calkins filed motions for change of venue on May 5, 1989, asserting they could not receive a fair trial, nor could an impartial jury be impaneled, in Rawlins. The motions were based on the volume of publicity the case received in the local press, as well as upon the economic and social role the Wyoming State Penitentiary plays in Carbon County and Rawlins.

This court has dealt with the subject of change of venue on many and varied occasions, and the law of this jurisdiction is well within the mainstream of other jurisdictions, taking account of United States Supreme Court decisions, as well as other relevant federal precedent. *See* Annotation, *Pretrial Publicity in Criminal Case as Ground for Change of Venue*, 33 A.L.R.3d 17 (1970); and Annotation, *Pretrial Publicity as Affecting Defendant's Right to Fair Trial*, 10 L.Ed.2d 1243 (1964).

Change of venue was, perhaps, most eloquently discussed by Justice Blume in *State v. Hambrick*, 65 Wyo. 1, 196 P.2d 661 (1948), *reh'g denied*, 65 Wyo. 1, 198 P.2d 969. In *Hambrick*, a defendant was found guilty on forty-six counts of embezzling funds from Memorial Hospital of Carbon County. A vituperative editorial appeared in the local paper only two days before trial. A motion for change of venue was denied when the trial court was able to impanel an impartial jury. This court held that it is insufficient to merely show that great prejudice exists against an accused, rather, it must appear that the prejudice existing will have the effect of denying the accused a fair trial. Moreover, the decision to grant a change of venue is within the sound discretion of the trial court and, unless there has been an abuse of that discre-

1. W.S. 6–2–201 (June 1988 Repl.) provides:
   (a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of removal, or if he unlawfully confines another person, with the intent to:
   (i) Hold for ransom or reward, or as a shield or hostage;
   *   *   *   *   *   *
   (b) A removal or confinement is unlawful if it is accomplished:
   (i) By force, threat or deception; or
   *   *   *   *   *   *
   (c) If the defendant voluntarily releases the victim substantially unharmed and in a safe place prior to trial, kidnapping is a felony punishable by imprisonment for not more than twenty (20) years.
   (d) If the defendant does not voluntarily release the victim substantially unharmed and in a safe place prior to trial, kidnapping is a felony punishable by imprisonment for not less than twenty (20) years or for life except as provided in W.S. 6–2–101 [murder in the first degree].

2. W.S. 6–2–502 (June 1988 Repl.) provides:

   (a) A person is guilty of aggravated assault and battery if he:

   *   *   *   *   *   *

   (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another; or

   *   *   *   *   *   *

   (b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

3. W.S. 6–10–201 (June 1988 Repl.) provides:

   (a) A person is an habitual criminal if:
   (i) He is convicted of a violent felony; and
   (ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.
   (b) An habitual criminal shall be punished by imprisonment for:
   (i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;
   (ii) Life, if he has three (3) or more previous convictions.

tion, the supreme court cannot intervene. *Id.*, 65 Wyo. at 13–20, 196 P.2d at 663–67.

In *Collins v. State*, 589 P.2d 1283, 1287–90 (Wyo.1979), this court repeated the conclusions reached in *Hambrick* and recognized that the fairness of a trial must be tested against the imperatives of Art. 1, § 10, Wyo. Const. and the sixth amendment, U.S. Constitution. In *Collins* there was substantial publicity which had come to the attention of most of the venire of Gillette. That case involved the murder of two well-known citizens of Campbell County. In addition to the volume of publicity, a bombing occurred at the site of the murders shortly before trial, although no connection was established between the bombing and the murder trial. This court examined both the nature and the extent of the publicity and determined that it was factual, not inflammatory and not excessively extensive. Moreover, the district court was able to seat an impartial jury. Under those circumstances, this court held that the district court did not abuse its discretion in denying a motion for change of venue.

In *Murray v. State*, 671 P.2d 320 (Wyo. 1983), these time-honored and constitutionally sound principles were again employed. *Id.*, 325–27. Murray was charged with attempted sexual assault and felony murder of an 82–year–old woman who resided in a small Wyoming town. In the assault, the victim suffered broken teeth, multiple bruises, and fractures of ten ribs. The pretrial publicity consisted of seven factual newspaper stories over a period of two months between the time of the crime and Murray's trial. Seven jurors were excused for cause because they stated they could not be impartial; however, a jury was seated in just over one day without significant difficulty. Again, this court concluded that the district court had not abused its discretion in denying a motion for change of venue.

■ Turning to our present case, we note that the news reports in the record reflect factual reporting of the circumstances of the crime, and none contain inflammatory language. Almost all were published within five months after the crimes, although the trial did not take place until almost fifteen months after the crimes were committed. A second round of factual reports appeared in December 1989. One item was a story about what life was then like for the two counselors who had been taken hostage a year before. Another dealt with a hunger strike that Amin and Calkins had undertaken in December 1989. Two other stories related that the trial had been delayed again, several continuances having been previously granted. This court concludes, in harmony with previous decisions in this regard, that neither the nature nor the extent of news coverage in this case provide justification for questioning the district court's decision to deny the motions for change of venue. *State v. Wagner*, 410 N.W.2d 207, 210–11 (Iowa 1987).

■ It was evident from voir dire that most of the persons called for jury duty had read or heard news reports about the crimes, but that was not universally true. The district court properly called to the attention of the jury pool the language of W.S. 7–11–106 (June 1987 Repl.)[4], which provides that juror exposure to publicity about a criminal case is to be anticipated and, indeed, jurors may even have formed an opinion as to the guilt of the accused, which by itself, is not a ground for requiring a change of venue. The test is whether a juror can lay aside his opinion and render a verdict based on the evidence. *See Smethurst v. State*, 756 P.2d 196, 198–99 (Wyo. 1988).

---

4. W.S. 7–11–106.
   (a) It is not cause for challenge that a person called to act as a juror in a criminal case has formed or expressed an opinion as to the guilt or innocence of the accused from news media reports or rumor if:
   (i) The prospective juror states that he can lay aside his impression or opinion and render a verdict based on the evidence presented in court; and
   (ii) The court is satisfied, from the examination of the prospective juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at trial.

Amin and Calkins point to incidents which occurred in the presence of the jury pool to demonstrate abuse of discretion in refusal of the motion for change of venue. These "incidents" inform us that potential jurors who held firm opinions about the case were removed from the pool, that queries into possibly prejudicial biases or knowledge of individual potential jurors were conducted out of the hearing of the rest of the pool, and that several potential jurors knew someone employed at the penitentiary. This illustrates a carefully controlled and thorough voir dire. This evidence is well short of that required to compel a change of venue. Most tellingly, we are able to review voir dire of those ultimately selected for the jury. There is nothing in their responses to suggest that any of the actual jurors would be unable to render a verdict in conformity with all standards relevant to a fair trial.

The record is thorough on this point, which made it possible to review the voir dire procedure for each juror. None of the incidents [5] referred to is significant nor any cause for the motion to be granted. Further, our study of the voir dire jury, those who actually served, revealed there was no evidence that any one juror would be unable to render a verdict in absolute conformity with all standards relevant to a fair trial.

Counsel for appellants refused at all stages to pass the jury for cause. However, they could not at the time enunciate a basis for this, nor can we find one in the record. We conclude refusal to pass the jury was simply a matter of strategy, because passing a jury for cause has been a factor weighed in determining whether denial of a motion for change of venue is an abuse of discretion.

Appellants also asserted that Rawlins and Carbon County are so aligned with the state penitentiary, because of economic and social reasons, that a fair and impartial jury could not be found there in a case such as this. Appellants cite no authority, and we find no supporting authority. We find no error here.

*Defense of Necessity*

Appellants contended that prison conditions were such that they feared for their lives and, thus, found it necessary to commit the acts charged in order to preserve their lives. As a part of their case on this issue, they offered the testimony of a physician/psychiatrist, Raymond Leidig. Dr. Leidig's proposed testimony was heard by the trial court in chambers as an offer of proof. Dr. Leidig would have testified that, given Amin's life-long struggle against discrimination and his tendency toward paranoia, he was convinced that Amin felt compelled to act as he did in taking a counselor as a hostage. Dr. Leidig theorized that Amin felt the system would respond to his grievances in no other way. This testimony was refused. Amin and Calkins also requested that the district court instruct on their "duress, compulsion, and necessity" theory of the case, and the court refused.

This issue is, in many ways, one of first impression in this state. *Keser v. State,* 706 P.2d 263, 269 (Wyo.1985), contains a

---

5. In one incident, a potential juror revealed that her husband worked at the penitentiary and a discussion had taken place between them about the case. As a result of that discussion the juror felt she had made up her mind about guilt or innocence. The juror was excused for cause. In another incident a potential juror stated he had worked at the penitentiary as a consultant in counseling and felt he would identify with the counselors who allegedly had been taken hostage. Upon more detailed questioning, it was established that that was an initial, emotional reaction and he stated he could put aside his opinions and decide the case based solely on the evidence. This juror was not excused for cause, but was struck from the jury by a peremptory challenge. Another venire person stated he had made up his mind; thereafter all discussions with him were in the trial court's chambers, and he was challenged and excused for cause. Yet another revealed she knew one of the counselors and, thereafter, at the bench and not before the other jury panel members, revealed more about this and she was excused for cause. Another knew one of the counselors, had talked to her, revealed nothing about their conversation, was not excused, but was struck by a peremptory challenge. Several revealed they knew people who worked at the penitentiary, including a close family member in one instance.

useful listing of recognized common law and statutory defenses. We have not adopted all of those defenses in Wyoming, but the ones at issue here are included in that list. In discussing the law of self-defense, we have recognized that the theory of self-defense arises out of "necessity." *Garcia v. State*, 667 P.2d 1148, 1152–53 (Wyo.1983) (quoting *Durham v. State*, 29 Wyo. 85, 96, 210 P. 934, 938 (1922)).

■ Coercion or duress has been recognized as a defense to criminal charges, other than a charge of taking the life of an innocent person. Coercion or duress must be present, imminent or impending, and of such a nature so as to induce a well-grounded fear of death or serious bodily harm if the otherwise criminal act is not done. *State v. Little*, 67 N.C.App. 128, 312 S.E.2d 695, 697–98 (1984), *review denied* 311 N.C. 307, 317 S.E.2d 905. The burden of demonstrating the elements of such a defense is upon the defendant. In *Little*, prison inmates had escaped from confinement and kidnapped prison officials. In holding that the evidence presented at trial was insufficient to constitute the defense of duress or coercion, the court repeated a list of evidentiary requisites that must *all* be met in order for an inmate to raise such a defense:

> (1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;
>
> (2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any relief from such complaints illusory;
>
> (3) There is no time or opportunity to resort to courts;
>
> (4) There is no evidence of force or violence towards prison personnel or other "innocent" persons in the escape; and
>
> (5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.

*Id.*, 312 S.E.2d at 698. The North Carolina court noted that the charges of kidnapping and taking prison officials hostage were incompatible with the last two criteria.

Additionally, it held that the defendants failed to satisfy the first three criteria.

*Refusal of Testimony*

■ With the foregoing in mind, we hold that Dr. Leidig's testimony was not relevant to the defense that Amin and Calkins sought to raise, as it did nothing to establish any element of the proposed defense. In *Scheikofsky v. State*, 636 P.2d 1107, 1110 (Wyo.1981), we repeated our rule that a defendant's subjective belief about danger will not suffice; the apprehension must also be reasonable. Dr. Leidig's testimony only went to Amin's subjective belief. Here, the decision regarding admissibility was within the sound discretion of the trial court and, therefore, the trial court did not abuse its discretion in refusing to permit the irrelevant testimony to go before the jury. W.R.E. 402; *see also L.U. Sheep Company v. Board of County Commissioners of the County of Hot Springs*, 790 P.2d 663, 673 (Wyo.1990).

*Refusal of Instructions*

■ Amin and Calkins assert that the district court erred in refusing to give the following offered instructions:

> You are instructed that duress or coercion is a defense to the crimes charged in this case. If you find that Mr. Amin reasonably believed that his actions on December 2, 1988, were required to protect his most vital interests, you should find the Defendant Not Guilty.
>
> In order to rely on this defense it must appear from the evidence that lawful alternatives were ineffective or were no longer available to this defendant and the harm caused by their actions was outweighed by the need of the defendant's actions.

> You are instructed that it is Mr. Amin's position in the case that he was acting as a result of coercion or duress on the 2nd day of December, 1988.

> Mr. Amin's theory of the case is that he had no choice in holding Ms. France. The intolerable penitentiary conditions

caused Mr. Amin to fear for his life and when he could not make any changes through established channels, he was under duress, compulsion, and necessity to take action.

Duress, compulsion, or necessity are constraints upon the will, whereby a man is urged to do [that] which his judgment disapproves, and which it is presumed, his will, (if left to itself) would reject. As punishments are, therefore, only inflicted for abuse of that free will, which God has given to man, it is highly just and equitable that a man should be excused for those acts which are done through unavoidable force and compulsion.

Mr. Amin must go forward with some evidence to show duress, compulsion, or necessity, but once he has done so, the burden is on the State to prove beyond a reasonable doubt to prove that Mr. Amin did not act under duress, compulsion, or necessity.

Therefore, if Mr. Amin was under duress, compulsion, or necessity to act in regard to these charges, you must find him not guilty.

A defendant has the right to have instructions on his theory of the case or his theory of defense presented to the jury if the instructions sufficiently inform the jury of the theory or defense and if competent evidence exists which supports the law expressed in the instructions. *Thom v. State,* 792 P.2d 192, 195 (Wyo.1990). The trial court has a duty to give such instructions even though they might not be entirely correct, so long as they are sufficient to apprise the jury of the theory of the defendant. *Ellifritz v. State,* 704 P.2d 1300, 1302 (Wyo.1985). The instructions offered misstate the law to a considerable extent, but, more importantly, there is no evidence of record to support giving these, or any other instructions, on the defense of duress/coercion/necessity.

■ Like the accused inmates in *Little,* Amin and Calkins presented no evidence that (a) they were faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (b) there was not time for complaint to the authorities, or that such a complaint would have been futile; and (c) there was no opportunity to resort to courts to redress their grievances. To the contrary, appellants' evidence demonstrated that Amin had received vindication through the prison grievance mechanism on at least two occasions. Further, he had access to both the state and federal courts and, if he lacked success in his forays into the courts, it was only because his complaints lacked legal substance. Moreover, like the inmates in *Little,* Amin and Calkins committed acts of violence against penitentiary personnel. *See, United States v. Kinslow,* 860 F.2d 963, 965–66 (9th Cir. 1988) *cert. den.* —— U.S. ——, 110 S.Ct. 96, 107 L.Ed.2d 60 (1989); *In re Juvenile Appeal,* 184 Conn. 157, 439 A.2d 958, 961–62 (1981); Annotation, *Coercion, Compulsion, or Duress as Defense to Charge of Kidnapping,* 69 A.L.R.4th 1005 (1989); Annotation, *Duress, Necessity, or Conditions of Confinement as Justification for Escape from Prison,* 69 A.L.R.3d 678 (1976); Annotation, *Coercion, Compulsion, or Duress as Defense to Criminal Prosecution,* 40 A.L.R.2d 908 (1955); 4 Am.Jur. POF.2d 179 (1975).

We hold the district court did not err in refusing the instructions.

### Effective Assistance of Counsel

■ Finally, appellants assert counsel were ineffective in: 1) failing to call witnesses; 2) failing to have Calkins receive a second psychological evaluation; and 3) failing to ensure their presence at a hearing to determine whether a psychiatrist, who evaluated Amin but failed to file a report, should be held in contempt of court. Our standard for assessing effective assistance of counsel is well delineated. *Murray v. State,* 776 P.2d 206, 210 (Wyo.1989); *Cutbirth v. State,* 751 P.2d 1257, 1263–64 (Wyo.1988); *Frias v. State,* 722 P.2d 135, 145–47 (Wyo.1986).

The assertions that counsel failed to call witnesses who would have served to exonerate the defendants is speculation only. In chambers defense counsel stated that

the witnesses appellants wanted to subpoena would not have testified as appellants hoped they would.

Calkins received a second evaluation, but it was so negative counsel for defense did not want to use it. Calkins claimed that the second evaluator was an employee of the state (although he was not) and, therefore, not a competent evaluator. Thus, what Calkins wanted was a third evaluation because he neither liked the first done at Wyoming State Hospital nor the second done by an independent evaluator. The assertion that defendant Calkins should have been evaluated by a third psychiatric/psychologic evaluator is unsupported by governing law.

Finally, the assertion that Amin's and Calkins's presence at a hearing held for the purpose of requiring Dr. Leidig to provide the trial court with a written psychiatric evaluation of Amin was required by Wyo. Const. art. 1, § 10 and the sixth amendment, U.S. Const., cannot serve as a basis for reversal for several reasons. First, the report was provided to the defendants and the court in ample time so that it could serve the very purpose that it was designed to serve. Second, Dr. Leidig appeared in person to verify the premises contained in his written report. Third, even considered in the most favorable light possible, Dr. Leidig's report, as well as his oral testimony, did not and could not serve as a defense to the crimes that Amin and Calkins were convicted of in this case. We hold that Amin and Calkins were provided with effective assistance of counsel at their trial.

Finding no error in the proceedings below, we affirm the judgment and sentence of the district court.

URBIGKIT, Chief Justice, dissenting.

Trial in this case commenced on a Monday morning at 9:35 a.m. One defendant was a black inmate in the Wyoming State Penitentiary, which is situate in the town of Rawlins, Wyoming, with a population of slightly more than 10,000. Rawlins is a rural county with a population of approximately double that number. The co-defendant, Donald Brian Calkins, had previously been convicted of rape in Rawlins, Carbon County, Wyoming. The offenses charged were holding two female prison counselors hostage at knife point in a stand-off with prison officials which continued for eleven hours. Needless to say, there was great interest and concern within and without the community. The possibility of more serious trouble at the institution was not without recognition.

The Wyoming State Penitentiary is the fourth largest industry in Rawlins. A major effort for several years by the county's legislative delegation has been to increase employment by obtaining an additional penitentiary facility in that area. In terms of geography, Rawlins is isolated from other towns of significant population by more than 100 miles and the community, with only one newspaper, has a high direction for attention to local occurrences.

The offense occurred on December 2, 1988, and the trial commenced about fifteen months later on March 19, 1990. There had been massive publicity in the community during the hostage taking incident and it is fair to say that essentially every juror who was examined within the entire panel, except possibly one or two at the time of voir dire, had defined knowledge of the incident. The community alarm had been great at the time of the hostage taking and the interest, by virtue of the association of the community with the penal institution, continued to trial date. An early community newspaper story was highlighted by comment relative to the hostage taking, "a pair of convicted rapists wielding home-made knives."

Jury selection was completed on the first day just past 6:00 p.m. and opening statements and evidence followed the next day. On the third day, the jury was instructed and retired to consider the verdict at 4:43 p.m. and returned precisely forty-seven minutes later with a guilty verdict on all charges. Sentencing followed. The black man, Abdullah Kru Amin, received a sentence of two concurrent life sentences consecutive to a life sentence he was already serving. Calkins received two concurrent sentences of forty to fifty years as consec-

utive to previous sentences for which he had been incarcerated. In Wyoming, life sentences are life sentences, subject only to the Governor's constitutional power of commutation. *Osborn v. State*, 806 P.2d 259 (Wyo.1991).

In considering the evidentiary pathway of this case and resulting verdict and sentence, nothing of an unexpected or unusual nature occurred. Everyone knew in advance that the two defendants were guilty of serious offenses and, in due time, as the process was completed, they were appropriately convicted and sentenced.

There is a problem with this case and it is to that end that I urgently dissent. Compliance with neither Wyo. Const. art. 1, § 10 nor U.S. Const. amend. VI was provided to these two accused individuals and in no regard was a fair and impartial jury empaneled. Everyone knew that the defendants were guilty and, consequently, the search for an impartial jury was only minimum in form and nonexistent in substance. The topic presented by this majority is not the requirement of the justice delivery system to provide an impartial jury, but rather to what extent can obvious bias, prejudice, knowledge and societal inter-relation with the institution, the event and the participants thereof be pressured into a conclusion that for Wyoming, this is enough to offer. Of course, everyone acted in good faith, but the fact of the matter remains that the resulting jury was not impartial. This jury could have been sent to chambers immediately after the selection was completed with instructions to determine whether they could agree on guilt, and mathematical probabilities would teach us that no further proceeding would have been required.

Anyone familiar in experience and activity with jury selection can find from a careful review of these events in the one day process of jury selection that an attitudinal barrier of immense, if not impenetrable, character existed for defense to even have the opportunity to prove that some justification might exist for even perfunctory jury consideration. Particularly obtrusive

in the process was the *examination in open court* so that the composite knowledge was disseminated among all of the members of the sixty-nine person panel. Of the first twelve persons called when participants were still fresh and directed, eleven were removed for cause or peremptory challenge. In the nature of time constraints in this office and a challenge to pursue other cases, time and space is not justified in the close review which would have otherwise been appropriate about why this was not a fair and impartial jury. Additionally, the jury information sheets which must have been obtained with initial selection of the original panel are not made available in the record now provided for our review.

Appellants' counsel, diligent and conscientious, were neither uninformed nor complacent. Prior to trial, formal written motions for change of venue were twice made and the subject of venue, supplemented by an attempted peremptory challenge of the judge, was additionally addressed at least four other times.

During the one day voir dire jury selection process, objection to the panel, renewed motion for a change of venue, or a motion for a mistrial because of pollution of the jury panel present can be found in this record to have occurred at least seven times. Without any adverse intimation about the sincerity of the participants, almost every conceivable basis for bias, prejudice or partiality can be found within the one day's transcript of trial proceedings.

The character of this case is best illustrated by one juror who could not be removed for cause and was on the original twelve names selected, "Mrs. X", and a second juror who lasted through peremptory challenges because no more jurors were available, "Mr. Y". Other persons whose husbands had worked at the penitentiary or had children working there are not included in this illustrative segment. Unless otherwise indicated as bench discussion or in chambers, the examination was conducted in open court with all of the sixty-nine panel members present.[1]

---

**1.** It was an interesting panel. One of the members had a daughter who had been raped by an

Mr. Y was examined and then removed on the final try:

"(WHEREUPON, [Mr. Y] approached the bench).

"[MR. Y]: I didn't put it on my paper, but I have a 30, 35 percent loss in hearing. So, I don't know, you know, if that would be—

"THE COURT: Could you hear any of the things that went on this morning?

"[MR. Y]: I had difficulty with you, hearing you.

"THE COURT: I have a hard time hearing, too. But you make sure that you can hear me. If you have a problem hearing, raise your hand, and we'll repeat."

Other voir dire regarding "Mr. Y" included:

"[COUNTY ATTORNEY]: I guess I was almost finished with the four of you. We don't want to go over all the questions. Anything else that you have to offer? Yes, [Mr. Y].

"[MR. Y]: I work for the Forest Service. Part of my job is law enforcement with them.

"[COUNTY ATTORNEY]: As to rules and regulations of—

"[MR. Y]: This is the forest, strictly the forest.

"[COUNTY ATTORNEY]: Just some contact with law enforcement-type activity? Is that what you're saying?

"[MR. Y]: I don't understand your question.

"[COUNTY ATTORNEY]: You've had contact with issuing of citations, things like that?

"[MR. Y]: Yes—yes—yes.

"[COUNTY ATTORNEY]: And understand, then, maybe a little bit more about the process that we are required to prove guilt before guilt can be found?

"[MR. Y]: Yes.

"[COUNTY ATTORNEY]: You're still willing to do that?

"[MR. Y]: Yes, sir.

"[COUNTY ATTORNEY]: All right. Anything else that any of the four of you have to offer to all of the questions we've been talking about since 9:30 this morning? All of you feel you can be fair jurors for both sides and are willing to do that if called upon?

"[MR. Y]: Yes.

\* \* \*

"[ASST. PUBLIC DEFENDER]: All right. We're back again. I guess, first of all, [Mr. Y], I'd like to talk to you a little bit. Can you hear me all right?

"[MR. Y]: Just fine.

"[ASST. PUBLIC DEFENDER]: All right. If I've got this straight, you are actually a law enforcement officer?

"[MR. Y]: Well, actually, I'm not working for the Forest Service right now, but when I do work for them, seasonally, that is part of what I do.

"[ASST. PUBLIC DEFENDER]: All right. And you do work for them seasonally on a regular basis?

"[MR. Y]: Yes, I have been since 1982.

"[ASST. PUBLIC DEFENDER]: All right. And at that time, you would have the powers of a law enforcement officer?

"[MR. Y]: While in the forest, yes.

"[ASST. PUBLIC DEFENDER]: And you said that you've issued citations. Have you arrested people?

"[MR. Y]: We don't collar them and take them in and incarcerate them. We don't follow this procedure there. Basically, our directions are to try to instruct rather than to lay paper on them. This is their procedure.

inmate in the Wyoming State Penitentiary, a second had been raped by a black man and a third member of the panel had been held as a hostage at a time when a person among them had been killed. Two of the three were called to serve on the jury itself and one of those required a peremptory challenge for removal from the actual jury.

The juror who remained did so because of other more pressing difficulties facing the defense counsel in exercise of their peremptory challenges.

"[ASST. PUBLIC DEFENDER]: Okay. But you do have some duties of a law enforcement officer?

"[MR. Y]: Yes—yes.

"[ASST. PUBLIC DEFENDER]: And from what you've said, I take it, you'd have certain empathy with law enforcement officers?

"[MR. Y]: No, I didn't say that.

"[ASST. PUBLIC DEFENDER]: All right. Well, what I asked you was, I guess I assumed from what you said, you have some empathy with law enforcement officers. Is that true or not true?

"[MR. Y]: No, I don't think so. I have some strong feelings toward how these things should happen. I don't feel that law enforcement officers are above other people or anything of that type, if that answers your question.

"[ASST. PUBLIC DEFENDER]: You're saying that you believe that law enforcement officials should be judged from the same perspective as other people?

"[MR. Y]: Absolutely.

"[ASST. PUBLIC DEFENDER]: All right. Maybe they should be judged more harshly, from the way you're talking.

"[MR. Y]: Yes. If you want my feelings on it, I think so, because we are in a position that I feel we should be—our integrity should be beyond reproach.

"[ASST. PUBLIC DEFENDER]: All right. Because of those feelings, if a law enforcement officer testified in this case, would you give them more credibility, do you think? Just natural feelings that they're professional law enforcement officers, and you'd believe what they said?

"[MR. Y]: No, sir, I would not. I know better than that.

"[ASST. PUBLIC DEFENDER]: Okay. How would you judge that? How do you feel about that?

"[MR. Y]: About what?

"[ASST. PUBLIC DEFENDER]: About what you just said, that you wouldn't give them more credibility. How would you judge them if they testify?

"[MR. Y]: They're human beings. We have to take every one on an individual basis, regardless of what their job is. My statement was, I feel that we should be more above reproach since we are in this position.

"[ASST. PUBLIC DEFENDER]: You also said that you had—and I don't want to misquote you—you had some very strong feelings about the legal system or law enforcement system.

"[MR. Y]: Yes, I mentioned all three: judicial, penal, correctional, and law enforcement.

"[ASST. PUBLIC DEFENDER]: Do you think that the system is, perhaps, too lenient?

"[MR. Y]: Yes.

"[ASST. PUBLIC DEFENDER]: And do you think that to an extent that you disagree with certain elements of the law, like that the State has to prove someone guilty beyond a reasonable doubt?

"[MR. Y]: No, that is not—I think that is a good point.

"[ASST. PUBLIC DEFENDER]: Okay. You've heard the various legal issues that we've been talking about before?

"[MR. Y]: Such as what?

"[ASST. PUBLIC DEFENDER]: Like the one I just mentioned, about guilt beyond a reasonable doubt.

"[MR. Y]: Yes.

"[ASST. PUBLIC DEFENDER]: And the burden of proof being on the State.

"[MR. Y]: Yes, I have.

"[ASST. PUBLIC DEFENDER]: And that the defendant doesn't have to show anything. Mr. Amin can remain silent. You've heard all that, right?

"[MR. Y]: Yes, I have.

"[ASST. PUBLIC DEFENDER]: Are there any of those concepts we've talked about that you disagree with?

"[MR. Y]: No.

"[ASST. PUBLIC DEFENDER]: Okay. So, you would be able to follow the Judge's instructions on what the law was?

"[MR. Y]: Absolutely, to the best of my ability.

"[ASST. PUBLIC DEFENDER]: Okay. Now, when you say the best of your ability, is that—

"[MR. Y]: Well, sir, I can't go beyond my ability either to comprehend or to do.

"[ASST. PUBLIC DEFENDER]: I just want to make sure. From everything you know, you'd follow the instructions, is what you're saying.

"[MR. Y]: Absolutely.

*     *     *

"[ASST. PUBLIC DEFENDER]: All right. Then if we could move on to the question of race and Mr. Amin being black. Is there anyone here who would like to talk about that at the outset?

"[MR. Y], do you think that would interfere with your judgment in this case?

"[MR. Y]: Not at all.

"[ASST. PUBLIC DEFENDER]: Do you think that there is anything to the notion of white supremacy groups? [A]bout superiority of white over other races?

"[MR. Y]: You're asking, do I agree with these groups?

"[ASST. PUBLIC DEFENDER]: Yeah.

"[MR. Y]: No.

*     *     *

"[ASST. PUBLIC DEFENDER]: Now, the issue about Mr. Amin being an inmate. Again, I guess, [Mr. Y], I'd be interested in how do you look at that? Do you think he should have fewer rights because he's an inmate?

"[MR. Y]: No.

"[ASST. PUBLIC DEFENDER]: So, as far as the courtroom proceedings go, you wouldn't look at him differently because he's out there at the penitentiary?

"[MR. Y]: No.

*     *     *

"[ASST. PUBLIC DEFENDER]: Okay. Thank you. Then, [MR. Y], one more question here.

"[MR. Y]: Fire away.

"[ASST. PUBLIC DEFENDER]: You said something, that you disagreed about the penal system. Could you elaborate on problems that you see with the penal system?

"[MR. Y]: You want my opinion on the whole penal system?

"[ASST. PUBLIC DEFENDER]: Well, if you could keep it brief.

"[MR. Y]: Well, it would be a fact or two. I don't know. I don't know, really, what you're looking for. I just don't feel like—I guess, my feelings are—do you want me to go ahead openly or [do] you want me to approach the bench.

"[ASST. PUBLIC DEFENDER]: Well, if you have some doubts—

"[MR. Y]: I'm not going to be embarrassed about it at all.

"[ASST. PUBLIC DEFENDER]: Well, might I?

"[MR. Y]: Possibly, yes.

"[ASST. PUBLIC DEFENDER]: Your Honor, could we approach the bench?

"THE COURT: Sure. Why don't you come up here.

"(WHEREUPON, the following proceedings were held not within the hearing of the prospective jurors:)

"[MR. Y]: All right. My problem is with the leniency of it. And I think that the judicial system is punishing the innocent, letting the guilty go free. And from my association with people who have been in other penal systems, by their own mouth—for instance, one that's been to Tucker Farm (phonetic) in Arkansas, which is my home state—he says, 'If they had sent me here first,' and he had been in four, he said, 'there never would have been another time.'

"So, I guess, basically, without going into any more detail, this is my feeling on this. I feel that there's law enforcement officers running around that aren't doing their job, taking the money but they're not doing their job. You know, this can go on until midnight. Specific questions that you want to ask?

"[ASST. PUBLIC DEFENDER]: Well, I guess, I worry that, you know, my client is an inmate out there.

"[MR. Y]: Yes.

"[ASST. PUBLIC DEFENDER]: And judging the system, you know, I want to make sure my client gets a fair trial, and that's why I want to ask about your views on the penal system. Would you be able to look beyond those views and judge Mr. Amin fairly, is what we're getting at.

"[MR. Y]: The only thing that I foresee, only problem I foresee in myself, if we are to have inmates on the witness stand, I have problems, because these guys aren't in there because they're good guys.

"[ASST. PUBLIC DEFENDER]: Okay.

"[MR. Y]: And I would have problems as to the veracity of their testimony, see, and I would, as far as that goes, with anyone. But all we can do is accept them at face value.

"[ASST. PUBLIC DEFENDER]: As a member of the jury, you would have to make a determination as to the facts. And there might be inmates that testify. My question is, could you give Mr. Amin a fair trial because, you know, there might be some inmates who testify. Would that interfere with you sitting on the jury?

"[MR. Y]: I feel that I can consider the evidence that's presented, and make my judgment according to this. And I think that's what's being asked of me.

"[ASST. PUBLIC DEFENDER]: Okay."

Mrs. X was examined as follows:

"Any of you acquainted with Duane [Shillinger, the prison warden]? Lots of hands. Okay. Let's start on the other side.

\*   \*   \*

"[COUNTY ATTORNEY]: How do you know Duane Shillinger?

"[MRS. X]: Well, my husband worked at the penitentiary at one time.

"[COUNTY ATTORNEY]: Okay.

"[MRS. X]: In maintenance. And I've met Mr. Shillinger through him.

"[COUNTY ATTORNEY]: How long has he been—did he retire?

"[MRS. X]: He retired in January of '89. He had worked six and a half years there in maintenance.

"[COUNTY ATTORNEY]: So, he worked at the pen, was just getting to retire, when this occurred?

"[MRS. X]: Yes.

"[COUNTY ATTORNEY]: And he was in maintenance, so he wasn't involved in the incident, I presume?

"[MRS. X]: Yes, he was.

"[COUNTY ATTORNEY]: He was involved in the incident?

"[MRS. X]: Yes.

"[COUNTY ATTORNEY]: Have you talked with him about this case?

"[MRS. X]: Yes, but, you know, at the time it happened.

"[COUNTY ATTORNEY]: And have you, as a result of those conversations and his knowledge of the facts, have you made up your mind, either one way or the other, about the guilt or innocence of these two men? And, again, [you] don't have to tell us how you made up your mind, just whether you have.

"[MRS. X]: Well, I imagine I have, in a way, yes.

"[COUNTY ATTORNEY]: You've kind of made some preliminary conclusions as to what did or didn't happen?

"[MRS. X]: Yeah, um-hmm.

"[COUNTY ATTORNEY]: There's nothing wrong with that, nothing at all. The question is, are you able to put that aside, forget those preliminary conclusions, forget the facts you may have been told, and listen to the facts as they're presented?

"[MRS. X]: I think I can, yeah.

"[COUNTY ATTORNEY]: It's the same as reading the paper, I guess, actually. You think you have the ability to do that?

"[MRS. X]: I guess so.

"[COUNTY ATTORNEY]: I guess, maybe the passage of time will help, as

well. Some of the facts relayed to you, you may have forgotten?

"[MRS. X]: Yes.

"[COUNTY ATTORNEY]: So, you think you can still be a fair juror?

"[MRS. X]: Yes.

"[COUNTY ATTORNEY]: And your husband is not connected with the penitentiary anymore, so that's not a problem?

"[MRS. X]: No, he's not.

"[COUNTY ATTORNEY]: I guess, go back to the original question, your acquaintance with Duane. Anything about that acquaintance—

"[MRS. X]: It's not social. I mean, I've met him three, maybe half a dozen times.

"[COUNTY ATTORNEY]: Okay. So, nothing that would affect the way you listen to him as a witness?

"[MRS. X]: Oh, no.

"[COUNTY ATTORNEY]: You'll listen to him the same as all other witnesses?

"[MRS. X]: Right.

\* \* \*

"[COUNTY ATTORNEY]: Okay. I guess I've got to keep track of where I'm at. Anybody else with close friends that work at the pen, like Mr. * * *'s example? Yes, ma'am.

"[MRS. X]: Well, my husband and I are acquainted with some of the maintenance men over there in the office.

"[COUNTY ATTORNEY]: You've maintained those relationships since his retirement?

"[MRS. X]: Yes, definitely.

"[COUNTY ATTORNEY]: Any of those that work in the maximum security unit?

"[MRS. X]: No.

"[COUNTY ATTORNEY]: Maintenance maybe goes everywhere at the institution?

"[MRS. X]: I know a few guards, but I don't even know where they work.

"[COUNTY ATTORNEY]: Same question applies. Does that bring you any closer to the penitentiary and, therefore, biases you so much that you couldn't be a fair juror?

"[MRS. X]: I don't think so.

"[COUNTY ATTORNEY]: And as we've discussed, we all have some biases and some prejudices. And, again, that's human nature. But we need to be as open as we can about those, and tell us, in your own minds, if you can put those aside.

"One of the big issues will be these two men are inmates and were at the institution when this occurred. And the question that needs to be posed is, you understand that just because they were at the institution and may have been there for some prior crime, that doesn't make them automatically guilty of this crime? Do you all concur with that and understand that philosophy, that they are innocent at this time? And are you able to put aside the fact that they were inmates at the time this allegedly occurred? Does everybody understand that? So, the fact that they're inmates won't bias you so much against them that you're unable to give them a fair trial.
\* \* \*

\* \* \*

"How many of you remember the publicity? Fairly reasonable response. Everyone, I guess, remembers something about the case. I don't know exactly how we want to discuss this. Did that publicity make anyone's mind up, that they think they would be unable to be a fair juror? Anyone that's decided that because it was in the paper, it happened, and if I'm a juror, I don't need to hear the evidence, I'll make a decision right today, before we start the trial? Anybody that's of that nature?

"You read the articles. Any of you recall the specific facts of the articles or the news reports? Any of you recognize these two men from their pictures that might have been on TV or in the paper? [Mrs. X]?

"[MRS. X]: Yeah, I think they were on TV.

"[COUNTY ATTORNEY]: Okay. And that would have been like when this incident occurred?

"[MRS. X]: When it occurred, uh-huh.

"[COUNTY ATTORNEY]: Are you willing to put that aside? You know that doesn't mean they're guilty. That doesn't mean they did what they're charged with, and that they still deserve a fair trial based on the evidence in this courtroom. Do you agree with that?

"[MRS. X]: Yes.

\*    \*    \*

"[ASST. PUBLIC DEFENDER]: Your Honor, at this time, I would renew the motion for change of venue based on what we've seen so far in voir dire. And I'd like to explain that.

"I guess, our worries, fears have come true by [County Attorney's] voir dire of the people that are on the panel we have. Everybody has heard about the case. We have, for instance, [Mrs. X], who's husband worked at the penitentiary, worked there at the time that the incident took place, has friends out there, and says she can overlook that and be a fair juror.

"We have Mr. \* \* \*, who gave some answers that he was biased and was looking at the case one way, and then, all of a sudden, he said that he could ignore that and be a fair juror.

"We have the psychologist who's worked at the penitentiary.

"Almost everybody here knows—I mean, for instance—Bob Burgess or knows Warden Shillinger.

"Entire situation brings out the fears that we had about doing this case here. And we would ask, at this point, to change the venue because of those very facts that give rise to these horrendous problems in trying to pick a jury.

"I think, throughout this case, as Mr. Amin's attorney, I've assured him that he should trust in the system, and we would represent him, do the very best job we could for him. I know he is hesitant to take that advice from me. And he has feelings that the system isn't fair. And when you're sitting there and looking at the people who are on this jury, and the knowledge they have about this case, I think we're in a bad situation as far as picking a fair jury. And for that reason,

we would renew that motion for a change of venue at this time. And perhaps co-counsel or another attorney would like to add things. But that's just my feelings at this point.

\*    \*    \*

"[ASST. PUBLIC DEFENDER]: All right. Is there anyone else here who wants to talk about this media situation, that you're a little hesitant about how you fit into this, now's the time.

"Okay. [Mrs. X], I'd like to talk to you a little bit about what you said. Because with all of your knowledge and what's happened, I'm kind of scared. You understand that?

"[MRS. X]: Sure.

"[ASST. PUBLIC DEFENDER]: You said, first of all, that your husband worked at the penitentiary for about six years?

"[MRS. X]: Six and a half.

"[ASST. PUBLIC DEFENDER]: Six and a half years.

"[MRS. X]: Retired the month after this occurred.

"[ASST. PUBLIC DEFENDER]: Okay. And you not only said that, but you told us that he was somehow involved in this incident; is that correct?

"[MRS. X]: Yes. Well, being with maintenance, he had to be over there. And I can't remember what it was, whether it was the lights from the outside to be turned off or something so that they could see what was going on inside. You know, we haven't talked about it. You know, at the time it was talked about quite a bit.

"[ASST. PUBLIC DEFENDER]: Do you remember the day that this incident happened?

"[MRS. X]: The exact date?

"[ASST. PUBLIC DEFENDER]: No, just do you remember? In your mind, do you remember it?

"[MRS. X]: Oh, sure. Oh, yeah, because he had to be called. He was called in later that afternoon. He was on the late shift.

"[ASST. PUBLIC DEFENDER]: So, he was called in at an odd time?

"[MRS. X]: Um-hmm.

"[ASST. PUBLIC DEFENDER]: And were you frightened when you heard what was going on?

"[MRS. X]: Sure.

"[ASST. PUBLIC DEFENDER]: I assume you were frightened for your husband?

"[MRS. X]: Yeah.

"[ASST. PUBLIC DEFENDER]: And with that kind of background, do you think, in a way, that you've prejudged this case?

"[MRS. X]: I probably have because I, you know, know from first-hand information, not through television or papers, but through somebody who was there at the time. I could see, you know, like if I had seen it in the paper or, you know, on the television, but I have had somebody who came home and talked about it, of course.

"[ASST. PUBLIC DEFENDER]: How long did he work that day?

"[MRS. X]: Well, I think he was called in earlier than his shift, and then I believe he worked up until—I think it was 9:00, 10:00 that night, that he was on that shift.

"[ASST. PUBLIC DEFENDER]: And I'm sure you were concerned that whole period?

"[MRS. X]: Of course.

"[ASST. PUBLIC DEFENDER]: You said earlier that you've, in a way, prejudged this case. You think you'd have a tendency to lean toward Mr. Amin being guilty at this point in time?

"[MRS. X]: Probably, yes.

"[ASST. PUBLIC DEFENDER]: Okay. I want to thank you for answering these questions. I really appreciate that.

"Your Honor, with that, I would challenge this person for cause.

"THE COURT: [Mrs. X], I'm going to read what the statute says again. It says:

"It is not cause for challenge that a person called to act as a juror in a criminal case has formed or expressed an opinion as to the guilt or innocence of the accused from news media or rumor, if the prospective juror states that he could lay aside his impression or opinion and render a verdict based on the evidence presented in court.

"The direction that you're going to get from me, as the presiding Judge, is that that is what your verdict should be from: people who testify on the stand and evidence that you hear in this courtroom. I'm going to ask that whatever your opinion, that you lay that aside in deference to what you hear under oath presented to you.

"So, my question to you now is, if you feel like you could lay aside any impression or opinion that you have and ultimately render a verdict which is based solely on the evidence that's going to be presented in this court.

"[MRS. X]: I think I could.

"THE COURT: All right. I'm going to deny your challenge.

*       *       *

"[ASST. PUBLIC DEFENDER]: [Mrs. X], back to you for a moment, if I could. You also said that you had friends who still worked at the penitentiary?

"[MRS. X]: Yes, the supervisor of maintenance.

"[ASST. PUBLIC DEFENDER]: And have you talked to any of those people about this case?

"[MRS. X]: No—no.

"[ASST. PUBLIC DEFENDER]: Okay. I couldn't remember.

"[MRS. X]: Probably, maybe when it first happened, we discussed it, but it hasn't been discussed for a year, I guess, or more.

*       *       *

"[ASST. PUBLIC DEFENDER]: [Mrs. X], you've been pushed around a lot in this case. Do you still think you could be a fair and impartial juror?

"[MRS. X]: I think.

"[ASST. PUBLIC DEFENDER]: Or would it worry you at this time that you might not be?

"[MRS. X]: No.

"[ASST. PUBLIC DEFENDER]: I wouldn't want you halfway through the

case and say, boy, I should have said I can't handle this.

"[MRS. X]: No, I think I could.

"[ASST. PUBLIC DEFENDER]: You still can?

"[MRS. X]: Yes, I think so."

Mrs. X was removed by peremptory challenge. Mr. Y remained when others more pressing, such as the woman whose daughter had been raped, required usage of the available remaining peremptory challenges.

The source material on jury trial attention to voir dire in obligation to find an impartial panel is unlimited in scope, intensity and relevance. Only because it is easily available and very current, a source as authored by a trial attorney is reflective:

It isn't easy for a new idea to squeeze itself into a head that is filled with prejudice. This simple aphorism illustrates the principle every trial lawyer instinctively recognizes: Even the most gifted advocate cannot change the mind of someone who is set against a cause that is being championed. That prejudiced people are unwilling to be "confused by the facts" has particular relevance in the trial arena. * * *

＊　＊　＊　＊　＊　＊

* * * A biased or prejudiced juror is one predisposed for or against a party, subject, or issue in a case. Attitudes are complex and comprehensive in form since they derive from personal and social conditions and experiences. A practical approach to understanding prejudice or bias is to consider both as forms of predisposition.

Perdue, *Defusing Jury Bias: How to Control the Impact of Prejudice*, Trial, April 1991, at 50 (endnotes omitted).

It is sheer sophistry to suggest in this case that the jury, when finally selected, would be impartial as required by the specific provision of the Wyoming Constitution. The inhospitality of this court to a requirement to comply with the state and federal constitutions has received prior note.

A change of venue in a criminal case by W.R.Cr.P. 23 (F.R.Cr.P. 21) is vested in the discretion of the trial court and since this specific rule was last adopted in 1969, this court has apparently never reversed a criminal conviction founded on claimed error in denied change of venue. Actually, compelling consideration has probably never been given to these attempts by counsel for the convicted defendant to reverse conviction since *Hamilton v. Territory of Wyoming*, 1 Wyo. 131 (1873) or about one hundred and fifteen years ago. In that case, the conviction for maintaining a house of prostitution was reversed, although not on the requested venue change but from prejudice of the judge in the misdemeanor case since the right to change the judge was mandatory, but to have a venue change was only discretionary. *See State v. Hambrick*, 65 Wyo. 1, 196 P.2d 661, *reh'g denied* 65 Wyo. 1, 198 P.2d 969 (1948) and *State v. Vines*, 49 Wyo. 212, 54 P.2d 826 (1936). Any criminal conviction appeal on a claim of abuse of discretion for a denied venue change with history lacking at least one success in over a hundred years is a slender reed for appellate advocacy.

*Murray v. State*, 776 P.2d 206, 211 (Wyo. 1989), Urbigkit, J., dissenting (footnote omitted) (many of the current cases are listed in n. 1 of Justice Urbigkit's dissenting opinion).

Apparently what we countenance is either a prompted or asserted willingness to listen. As anyone who knows anything about human conduct and behavior can quickly determine, there is a vast ocean between willingness to listen and fairness and impartiality in rendering decisions.

The asserted justification explaining why a case of this kind was not tried in adjoining towns, such as Casper, Laramie or Cheyenne, is cost. Considering the three day trial involved and the total number of witnesses, six by the state and three in total for the two defendants, the cost of a change of venue would certainly not have exceeded a few thousand dollars. It is incomprehensible to me that we should apply situational ethics to constitutional rights for modest monetary savings instead

of meeting the determinates of our constitution by providing a fair and impartial jury. The societal difficulty presented is that trial judges are given unlimited discretion in decision and the appellate court is faced in consideration for reversal with the then recognized substantial additional cost for retrial. There just is not any way that the trial of a hospital administrator for embezzlement can be compared with a black male in the state penitentiary holding a young female hostage, even though both occurred in Rawlins. *See State v. Hambrick*, 65 Wyo. 1, 196 P.2d 661, *reh'g denied* 65 Wyo. 1, 198 P.2d 969 (1948).

"Under the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution [and the Wyoming Constitution], criminal defendants are guaranteed 'the right to * * * trial by an impartial jury.' * * *

The securing and preservation of an impartial jury goes to the very essence of a fair trial. See *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, reh. den., 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965). It has long been recognized under the federal constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself. *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907) (Holmes, J.)."

*State v. Marshall*, 123 N.J. 1, 586 A.2d 85, 127 (1991) (quoting *State v. Williams*, 93 N.J. 39, 60–61, 459 A.2d 641 (1983)).

We should agree with New Jersey that our Wyo. Const. art. 1, § 10 provision should have comparable recognition:

"The courts in this state have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance. We have stressed repeatedly that the triers of fact must be 'as nearly impartial "as the lot of humanity will admit."' *State v. Singletary*, 80 N.J. 55, 62 [402 A.2d 203] (1979) (quoting *State v. Jackson*, 43 N.J. 148, 158 [203 A.2d 1] (1964), * * *."

*Marshall*, 586 A.2d at 127 (quoting *Williams*, 93 N.J. at 60–61, 459 A.2d 641).

Rather than summary disposition on the basis of justified discretion, this court should look back to the constitution itself to seek reason in result. *Martinez v. Superior Court of Placer County*, 29 Cal.3d 574, 174 Cal.Rptr. 701, 703–06, 629 P.2d 502, 504–07 (1981) (emphasis in original), in its four rules, could provide some guidance:

1. *The nature and extent of publicity evidences community bias and poses a danger to a fair trial.*

   \*　　\*　　\*　　\*　　\*　　\*

2. *Although not alone determinative, the size of the population of [the county] weighs in favor of a change of venue.*

   \*　　\*　　\*　　\*　　\*　　\*

3. *The nature and gravity of the offense, * * *, is a primary consideration in requiring a change of venue.*

   \*　　\*　　\*　　\*　　\*　　\*

4. *The status of the victim and the accused in the community are significant but not controlling factors in assessing the necessity for change of venue.*

These principles were rephrased in the succeeding case of *Williams v. Superior Court of Placer County*, 34 Cal.3d 584, 194 Cal.Rptr. 492, 494, 668 P.2d 799, 801 (1983):

(1) [T]he nature and extent of the publicity; (2) the size of the population of [the county], (3) the nature and gravity of the offense, (4) the status of the victim and of the accused, and (5) whether political overtones are present.

Application of the facts found by Amin and Calkins is directly contrary to the determination most recently made by the California Supreme Court in *People v. Daniels*, 52 Cal.3d 815, 277 Cal.Rptr. 122, 802 P.2d 906 (1991).

Placer County in California had an observable venue problem as reflected by a third case, *People v. Williams*, 48 Cal.3d 1112, 259 Cal.Rptr. 473, 774 P.2d 146

(1989). That case involved the brother of the defendant found in *Williams*, 194 Cal. Rptr. 492, 668 P.2d 799. With the slightly minimized factor that we have here—a noncapital case—however magnified by the circumstance of the hostage taking of two females in a penitentiary town, the second *Williams* case in thesis and result would almost be identical. Extensive publicity, high community interest, the status of the victims and the accused, the seriousness of the offense and the relationship to the community all commend that precedent to our attention. Compare the rule for Louisiana in *State v. Savage*, 575 So.2d 478, 483 (La. App.1991).

The obviousness of guilt and the disturbing nature of the offense involved should serve for no justification to shortcut or ignore constitutionally provided rights to the accused.

The problem is more pervasive than simple resort to a justified final end. It is in the perspective of the fairness of the system that the acceptance of the criminal and reconciliation to society can be obtained. Perceived injustice produces justified criminality in reaction. Nearly any expert on penology would quickly agree that the first criteria for a properly functional process for criminal apprehension, confinement and retribution is to be found in perceived fairness in system operation. The adverse pathway here is demonstrated in sequence as a procession of what finally happened by *Amin v. State*, 695 P.2d 1021 (Wyo.1985) (*Amin I*); *Amin v. State*, 774 P.2d 597 (Wyo.1989) (*Amin II*); and now resulting in the present appeal, *Amin III*. Ineffectiveness of counsel was obvious in the first trial, the post-conviction relief hearing was then denied, and now, in third sequence, an impartial jury is not provided.

If we were to apply the nine factors utilized by the state of Washington, we would fail in all but one:

"(1) [T]he inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial;

(4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of the prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn."

*State v. Hoffman*, 116 Wash.2d 51, 804 P.2d 577, 588 (1991) (quoting *State v. Crudup*, 11 Wash.App. 583, 587, 524 P.2d 479 (1974)). In agreement with that analysis, I remain convinced that any defendant, no matter how obvious the guilt or terrible the offense, should have a right to the determination of guilt by a fair and impartial jury. Justification of exercised discretion cannot be a substitute for reality.

Regretfully but respectfully, I dissent.